## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 11, 2012

Lyle W. Cayce
Clerk

No. 11-51202

GENE ATKINS,

Plaintiff - Appellant

v.

BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN;  THE
NFL SUPPLEMENTAL DISABILITY PLAN; MANAGEMENT TRUSTEES
OF THE NFL PLAYER RETIREMENT PLAN,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before REAVLEY, SMITH, and CLEMENT Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Gene Atkins, a former player for the New Orleans Saints and Miami
Dolphins National Football League ("NFL") teams, filed suit seeking more
generous disability benefits under the Bert Bell/Pete Rozelle NFL Player
Retirement Plan (the "Plan"). The district court granted summary judgment in
favor of the Plan, affirming its benefits determinations that Atkins is only
eligible for "Inactive" player disability benefits instead of the more generous
"Football Degenerative" disability benefits he seeks. Atkins challenges the

No. 11-51202

standard of review employed by the district court and the substantive merits of the benefits determinations. We AFFIRM.

## FACTS AND PROCEEDINGS

### 1. The Bert Bell/Pete Rozelle NFL Player Retirement Plan

The Plan is an employee, multi-employer welfare benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1002(3)(2)(A), 1002(37)(A), and the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141 *et seq.*, also known as the "Taft-Hartley Act." As required by statute, the Plan is jointly administered by employee (NFL players) and employer (NFL club owners) representatives. 29 U.S.C. § 186(c)(5)(B). Three player representatives are appointed by the NFL Players Association ("NFLPA") and three club ownership representatives are appointed by the NFL Management Committee ("NFLMC") (collectively the "Retirement Board" or the "Board"). The Retirement Board, which meets quarterly, is the "named fiduciary" of the Plan and is responsible for administering the Plan. The Plan grants the Board "full and absolute discretion, authority and power" to interpret the Plan and decide claims for benefits. The Plan also provides that, in exercising its discretionary powers, the Retirement Board "will have the broadest discretion permissible under ERISA and any other applicable laws."

The Plan provides monthly total and permanent ("T&P") disability benefits to eligible NFL players. Retired players such as Atkins may be eligible for benefits categorized as either "Football Degenerative" or "Inactive." A player may qualify for "Football Degenerative" T&P benefits if his disability "arises out of League football activities." A player may qualify for "Inactive" T&P benefits if his disability "arises from other than League football activities." Football Degenerative benefits are significantly greater than Inactive benefits. After an initial benefits determination, a player's benefit category may be altered only

2

upon a showing of "changed circumstances" based on "clear and convincing" evidence.

A player's claim for T&P disability benefits is first reviewed by the Disability Initial Claims Committee ("DICC"). The DICC is composed of two members, one appointed by the NFLPA and one by the NFLMC. If the two members of the DICC are deadlocked, the claim is deemed denied. Decisions of the DICC are appealable to the Retirement Board. If the members of the Retirement Board are deadlocked, they may vote to submit the matter to a Medical Advisory Physician ("MAP") for a determination regarding medical issues. In the event of a deadlock concerning eligibility or entitlement to benefits, the Retirement Board may vote to refer the dispute for final and binding arbitration.

## 2. Atkins' Initial Claim for Disability Benefits

Gene Atkins played professional football from 1987 until 1996, spending the majority of his time playing with the New Orleans Saints and the last several years with the Miami Dolphins. During his career he was well-recognized for his aggressive, hard-hitting play as a defensive back and he sustained a number of injuries resulting from on-field collisions.

In December 2004, Atkins submitted an application for disability benefits to the Plan administrators, claiming T&P disability as a result of three conditions stemming from his football career. The conditions Atkins listed were: (1) right shoulder ailments, including movement limitations and chronic pain; (2) chronic constant pain in his neck that radiated through his arms and hands, affecting his ability to drive, sense of touch, and ability to hold objects; and (3) depression and mood issues that limited his ability to function, due in part to his constant physical pain and inability to work. Atkins reported that he worked at a Target store for five months but had to stop because of pain, headaches, and difficulties in dealing with people.

No. 11-51202

Following receipt of his disability application, Plan administrators sent Atkins to two neutral physicians for evaluation, Keith Kesler ("Kesler"), a psychiatrist, and Tarek Souryal ("Souryal"), an orthopedist. Kesler reported that Atkins suffered from poor cognitive function, which he stated "cannot be determined" as to whether it resulted from football. Kesler also reported that Atkins had chronic pain and headaches, as well as possible neurologic defects, all of which were the result of football. Kesler found Atkins totally disabled as a result of his impairments. In contrast, Souryal reported that Atkins suffered from neck and shoulder impairments which were the result of football, but the impairments did not render him totally disabled.

Atkins' application and Kesler's and Souryal's reports were reviewed by the DICC on June 7, 2005. The two members deadlocked and the claim was deemed denied. Atkins appealed the decision to the Retirement Board as provided for under the Plan. The Retirement Board scheduled Atkins for two additional examinations by neutral physicians, orthopedist J. Bryan Williamson ("Williamson") and neurologist Raymond Martin ("Martin").

Williamson concluded that Atkins suffered from long-term neck and right shoulder impairments due to football-related injuries. However, Williamson also concluded Atkins was not totally disabled. Martin found that Atkins was totally disabled due to a combination of problems. He concluded Atkins' physical impairments were a result of football, but his memory problems were of an unknown source. He suggested that formal neuropsychological testing would have to be done to determine the etiology of Atkins' problems with intellect, memory, and mental status.

With the benefit of Williamson's and Martin's reports, the Retirement Board considered Atkins' claim at its next scheduled quarterly meeting held on October 20, 2005. The Retirement Board deadlocked and referred the matter to a MAP. The Plan defines a MAP as a board-certified orthopedic physician or a

No. 11-51202

physician in another medical discipline as designated by the NFLPA and NFLMC. A MAP has the authority to decide only those medical issues submitted by the Retirement Board. Atkins was referred to Thomas Boll ("Boll"), a Ph.D. clinical neuropsychologist, for an examination. The referral states that Boll was to evaluate the impaired body parts identified by Atkins, specifically his "head ache, numbness, shoulders, neck [and] hands."

Boll concluded that Atkins suffered from illiteracy and borderline mental ability, neither of which resulted from football. He further concluded that Atkins suffered from depression, which could not be determined to be the result of football, and pain which was the result of football. Specifically, Boll stated that "Atkins' difficulties appear to be primarily in the psychiatric arena and there is no evidence of a neurological disorder" and further concluded that Atkins' limitations are primarily the product of his "extremely limited" literacy that places him "at a substantial disadvantage with regard to a wide variety of occupational pursuits outside of those specifically related to the athletic field." Boll concluded that Atkins was totally disabled and suggested psychological and psychiatric intervention to increase his ability to function adequately on a day-to-day basis.

After receiving Boll's report, the Retirement Board considered Atkins' appeal in a meeting conducted on February 9, 2006. The minutes of the meeting reflect a decision to approve Inactive T&P disability benefits, retroactively effective to June 1, 2005. In a letter dated February 23, 2006, the Plan director explained the award of Inactive T&P benefits was for psychiatric impairments which did not "arise out of League football activities" under the language of the Plan. Atkins was informed his T&P disability benefits were therefore not categorized as Football Degenerative.

No. 11-51202

### 3. Atkins' Multiple Requests for Reconsideration

Atkins submitted another appeal to the Retirement Board by way of a letter dated March 3, 2006. In the letter, Atkins requested reclassification into the Football Degenerative category, stating that he believed his disability resulted from football activities. However, Atkins did not submit any additional evidence or argument in support of his reclassification request. On May 10, 2006, the Retirement Board tabled its consideration of the appeal to allow additional time for Atkins to be evaluated by a neutral physician.

Atkins was examined by neurologist Robert W. Gilbert, Jr. ("Gilbert") on June 12, 2006. Gilbert found that Atkins suffered from the impairments of right shoulder pain with limited motion, cervical spasms with neck and arm pain, and carpal tunnel syndrome. Gilbert concluded all of the impairments resulted from football, but also concluded that Atkins was not totally disabled as a result of his impairments.

After receiving Gilbert's report, the Retirement Board reviewed Atkins' appeal on July 19, 2006. The minutes of the meeting reflect that the Retirement Board denied the request for reclassification to Football Degenerative T&P disability benefits. A July 26, 2006, letter from the Plan director stated:

> By report dated June 12, 2006, Dr. Gilbert stated that you are not totally and permanently disabled by your head, neck and right arm conditions. The Retirement Board noted that Dr. Gilbert's report is consistent with earlier medical reports insofar as it states that your physical impairments are not, by themselves, totally and permanently disabling. The Retirement Board further found that Dr. Gilbert's report is consistent with its earlier conclusion that you are permanently and totally disabled by your psychiatric/psychological condition, which for the reasons described above, qualifies you for the Inactive category. In sum, the Retirement Board once again concluded that the Inactive category is the correct category for your T&P benefits based on the medical evidence in your file.

6

No. 11-51202

> You should regard this letter as a final decision on review within the meaning of Section 503 of the Employee Retirement Income Security Act. . . .You have the right to bring an action under section 502(a) of the Employee Retirement Income Security Act.

After receiving the letter, Atkins did not exercise his right to bring an action under ERISA § 502 to challenge the Retirement Board's benefits determination.

Following the Retirement Board's denial of his request for reclassification, Atkins sought the advice of noted neurosurgeon Dr. Robert Cantu ("Cantu"), an expert on brain trauma caused by athletics, including chronic traumatic encephalopathy ("CTE") suffered by former NFL players. After examining Atkins, Cantu opined that Atkins suffered from severe post-concussion syndrome and was "probably beyond that into early traumatic encephalopathy." Cantu also concluded that Atkins was unable to work indefinitely due to a "demented mental status."

Based on Cantu's findings, Atkins submitted a letter to the Retirement Board on August 23, 2007, in which he requested reconsideration of the denial of his reclassification request for Football Degenerative benefits. Cantu's report was submitted with the letter. The Board treated the letter as a request for reclassification of benefits from Inactive to Football Degenerative.

On October 4, 2007, the DICC considered and denied the request. An October 5, 2007, letter from the Plan director stated:

> After reviewing the available information, the Committee determined that you are totally and permanently disabled due to a psychiatric/psychological condition which precludes an award of Football Degenerative T&P disability benefits. The Committee also reviewed Plan section 5.6 regarding reclassification requests, and concluded that you have failed to present clear and convincing evidence that you qualify for Football Degenerative T&P benefits because of changed circumstances. Specifically, the Committee determined that the new evidence presented . . . relate[s] to the same condition that was the basis for the original classification. Accordingly, the Committee denied your request for reclassification.

7

No. 11-51202

In December 2007, Atkins received a favorable decision from the Social Security Administration in response to his application for disability insurance benefits ("DBI") and supplemental security income ("SSI"). The administrative law judge ("ALJ") presiding over Atkins' social security claim relied on the findings of Cantu and Dr. Ronald DeVere ("DeVere"), a neurologist appointed to assist the ALJ in determining whether Atkins was disabled. DeVere's findings indicated that Atkins had "a number of problems," including "evidence of some cognitive disorder, which . . . may be partially related to multiple head trauma he sustained over a nine-year career of professional football." The ALJ found Atkins to be disabled under the Social Security Act and awarded him benefits dating to January 1, 1998.

After receiving the decision from the ALJ, Atkins requested an appeal of the DICC's October 2007 decision by letter dated February 11, 2008. In support of the appeal, Atkins submitted additional documentation, including the ALJ's decision and DeVere's medical findings. On April 30, 2008, the Retirement Board tabled its consideration of Atkins' appeal to allow additional time for Atkins to be evaluated by a neutral MAP, neurologist James Gordon ("Gordon").

Gordon examined Atkins on June 25, 2008. He found that Atkins suffered from impairments of: (1) cognitive dysfunction; (2) depression; and (3) chronic and post-concussion headaches. Gordon concluded that the chronic and post-concussion headaches resulted from football, but that the other two impairments were only "in part" the result of football. Gordon also concluded that Atkins was totally disabled as a result of the impairments.

Gordon explained his diagnostic impressions:

Mr. Atkins' overall picture includes elements of psychiatric dysfunction, cognitive dysfunction, and headache that most likely result from a combination of constitutional and environmental factors, none of which, alone, would explain his current condition. There is little doubt that recurrent head trauma of a concussive and

sub-concussive type contributes to these disorders, though relative effect of head trauma is difficult to quantitate. . . . It is impossible to distinguish the precise extent to which head injury causes, rather than exacerbates, Mr. Atkins's headaches, cognitive and behavior problems, given preexisting neuropsychological limitations and psychiatric predispositions. What is clear, however, is that he suffers disabling chronic headache, depression and cognitive limitations, and that recurrent head trauma resulting from his role as an NFL defensive back contributed significantly to his current condition, even if that contribution cannot be reliably quantitated. In his current condition, he cannot be gainfully employed.

**4. Lawsuits and Arbitration**

Before the Retirement Board could meet in November 2008 to consider Atkins' appeal and Gordon's findings, Atkins filed suit against the Plan in district court on August 29, 2008, seeking benefits under ERISA. *Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 1:08-CV-651-SS, Dkt. 1 (W.D. Tex. Aug 29, 2008) (the "First Lawsuit"). The suit was ultimately dismissed without prejudice based on a stipulation of the parties in light of the ongoing appeal being considered by the Retirement Board. (*Id.*, Dkt. 29).

When the Retirement Board finally met to consider Atkins' appeal on November 11, 2008, the Board deadlocked on Atkins' request for reclassification and referred the issue for final and binding arbitration pursuant to section 8.3(b) of the Plan.

On June 18, 2009, an arbitration hearing was conducted before Richard Kasher ("Kasher"). A number of exhibits, including the deposition testimony of Cantu and Gordon, were introduced. In addition, Atkins and his then-wife Patricia Atkins testified at the hearing. Kasher conducted an additional hearing on August 17, 2009, at which Boll testified and more evidentiary exhibits were introduced. The arbitration record ultimately included more than 4,000 pages.

Kasher issued his decision on April 12, 2010, finding there was insufficient evidence to conclude Atkins had proven his level of benefits should be

No. 11-51202

reclassified under the Plan. In a lengthy opinion, Kasher reviewed the medical evidence and testimony presented during the hearings. In pertinent part, the opinion stated:

> In this Arbitrator's opinion it is also significant to note that Dr. Cantu candidly testified that he was not able with "100% percent accuracy" to diagnose Mr. Atkins with CTE. More importantly, Dr. Cantu testified that Mr. Atkins has "all three aspects of the triad" of CTE; and thus Dr. Cantu testified that he has a "high index of suspicion" that Claimant Atkins suffers from CTE. Again, Dr. Cantu testified candidly that he could not "say with . . . scientific certainty" that Mr. Atkins has CTE, and could only do so "when his brain is studied."
>
> Dr. Cantu's opinion is qualified by his finding that Mr. Atkins' CTE is based upon a "more probably than not" diagnosis. Such an opinion, as well-founded as it is by Dr. Cantu, a highly-qualified and well-respected medical practitioner, does not, in this Arbitrator's opinion, meet the "clear and convincing" standard of proof required to sustain Mr. Atkins' claim.
>
> . . .
>
> The findings of Doctors Cantu, DeVere and Gordon regarding Mr. Atkins' history of head trauma are, as the Owner Trustees have correctly pointed out, all premised upon the reports made by Mr. Atkins some nine to ten years after those alleged incidents. The incidents are not set in time and do not reference which teams the Saints were playing, nor is there any evidence that the incidents were reported to the Saints or the Dolphins trainers or Club physicians.
>
> Therefore, the resolution of the issues in this case require the analysis of the two plausible medical opinions/diagnoses of Gene Atkins' cognitive dysfunction.
>
> In this Arbitrator's opinion, neither the opinions of Doctors Cantu, Gordon and DeVere on the one hand and Dr. Boll on the other rise to the level of clear and convincing evidence. And, as noted above, this Arbitrator is bound by that standard of proof.

No. 11-51202

Therefore, Mr. Atkins's claim falls into the realm of "probability", as both Doctors Cantu and Boll have implicitly acknowledged.

It is "probable" that Gene Atkins experienced more than one concussion event/incident during his ten year career as a professional football player; and that one of those probable events/incidents, . . . may have resulted in some postconcussive symptoms, albeit they were not reported, recorded or treated.

That being said, this Arbitrator finds insufficient evidence to conclude that Gene Atkins has proven that his level of benefits should be reclassified under the provisions of the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

Accordingly, this Arbitrator is compelled to deny Mr. Atkins' claim.

The NFLPA trustees requested reconsideration of Kasher's decision. On November 29, 2010, Kasher denied the request. In so doing, he noted that he had "fully considered the contradictory medical opinions and the evidence of Mr. Atkins' injuries and symptoms" and was not prepared to reopen the record. Subsequently, and in accordance with section 8.3 of the Plan, the Retirement Board adopted Kasher's decision at its February 23, 2011 meeting.

While the NFLPA trustees' request for reconsideration was still pending, Atkins filed the lawsuit that forms the basis for this appeal on July 9, 2010 (the "Second Lawsuit"). Atkins filed several motions seeking to compel discovery regarding aspects of the Plan's claim handling process, potential conflicts of interests involving members of the Retirement Board, and the Plan's handling of other T&P disability benefits claims, as well as challenging the scope of documents designated as part of the administrative record. The district court denied the majority of the motions with the exception of allowing discovery regarding some of the Plan's handling of prior claims.

In November 2011, the district court granted summary judgment in favor of the Plan and denied Atkins' motion for summary judgment. *Atkins v. Bert*

No. 11-51202

*Bell/Pete Rozelle NFL Player Retirement Plan et al.*, No. 10-CV-515, slip op. at 18 (W.D. Tex. Nov. 10, 2011). While Atkins argued that the district court should review the benefits determinations under a *de novo* standard of review, the court agreed with the Plan, citing Supreme Court precedent, that abuse of discretion is the proper standard of review when considering an ERISA plan's fiduciary's benefits determinations. *Id.* at 12–14. The district court then considered the merits of Atkins' challenges to the Plan's benefits determinations and held that the Retirement Board, under the Plan provisions, had not abused its discretion by awarding Atkins T&P disability benefits under the Inactive category instead of the Football Degenerative category. *Id.* at 15–16. Additionally, the court found that Atkins failed to establish that Kasher's arbitration decision was procedurally unreasonable. *Id.* at 17.

On appeal, Atkins challenges the district court's decision to apply abuse of discretion instead of *de novo* review to the Plan's benefits determinations and he challenges the merits of the specific benefits determinations made by the Retirement Board in 2006 and 2011 and by arbitrator Kasher in 2010.

## STANDARD OF REVIEW

"Standard summary judgment rules control in ERISA cases." *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 651 (5th Cir. 2009) (quoting *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 225 (5th Cir. 2004)). We review the grant of summary judgment *de novo*, applying the same standard as the district court. *Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 217 (5th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

We also review *de novo* the district court's selection of the appropriate standard of review to be applied to an ERISA administrator's eligibility determination. *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d

No. 11-51202

211, 213 (5th Cir. 1999). Unless the terms of the plan give the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]" an administrator's decision to deny benefits is reviewed *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, if the language of the plan does grant the plan administrator discretionary authority to construe the terms of the plan or determine eligibility for benefits, a plan's eligibility determination must be upheld by a court unless it is found to be an abuse of discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 111, 115). Independent of the administrator's ultimate authority to determine benefit eligibility, factual determinations made by the plan administrator during the course of a benefits review will be rejected only upon a showing of abuse of discretion. *Meditrust Fin. Servs. Corp.*,168 F.3d at 213.

In the ERISA context, "[a]buse of discretion review is synonymous with arbitrary and capricious review." *Cooper*, 592 F.3d at 652. This standard requires only that substantial evidence supports the plan fiduciary's decision. *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)). "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (citing *Meditrust Fin. Servs. Corp.*, 168 F.3d at 215). Moreover, this court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness—even if on the low end." *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007)

No. 11-51202

(quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 297 (5th Cir. 1999) (en banc)).

## DISCUSSION

**1. Abuse of discretion review of the Retirement Board's 2011 benefits determination**

Atkins argues the Retirement Board's benefits determination in 2011, in which the Board adopted Kasher's arbitration decision that Atkins failed to prove changed circumstances for reclassification to Football Degenerative benefits by clear and convincing evidence, should be reviewed *de novo* due to two procedural irregularities. Atkins asserts that because Kasher did not have discretionary authority to make a benefits determination under the Plan and because the Retirement Board's decision to adopt Kasher's decision was untimely under the Plan's claims procedures, the district court erred by using abuse of discretion instead of *de novo* review.

Atkins made similar arguments to the district court in seeking *de novo* review of the Board's 2011 decision. He challenged, among other things, the Retirement Board's referral of his appeal to Kasher and the delay in making a benefits determination. In a well-reasoned rejection of these arguments, the district court cited Supreme Court and Fifth Circuit precedent for the proposition that the deferential abuse of discretion standard of review granted to ERISA plan decisions should not be altered absent a finding that the plan administrator "acted in bad faith or would not fairly exercise his discretion to interpret the terms of the Plan." *Conkright v. Frommert*, 130 S. Ct. 1640, 1648 (2010).

We agree with the district court's reasoning. This circuit has rejected arguments to alter the standard of review based on procedural irregularities in ERISA benefit determinations, such as delays in making a determination. *See S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir. 1993). Absent

14

potential wholesale or flagrant violations that evidence an "utter disregard of the underlying purpose of the plan," this court does not heighten the standard of review from abuse of discretion to *de novo*. *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 159 (5th Cir. 2009) (quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971 (9th Cir. 2006) (en banc)); *see also Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 538 (5th Cir. 2007) ("[Appellant] encourages us to heighten our standard of review due to the procedural irregularities in the handling of his [ERISA] claim . . . . [Appellant] has cited no direct authority by the Supreme Court or the Fifth Circuit dictating a change in the standard of review based upon procedural irregularities alone, and we see no reason to impose one.").

Neither the delay in Atkins receiving a final decision nor the use of an arbitrator rises to the level of a flagrant violation or utter disregard of the Plan that might require a heightened standard of review. While there was a lengthy delay of more than two years between the filing of Atkins' 2008 appeal and the eventual final decision in 2011, Atkins was informed of the claim's status and he participated in the entire process, including testifying and introducing evidence at the arbitration proceeding. He also voluntarily dismissed the First Lawsuit in order to allow the arbitration process to proceed. Furthermore, the use of an arbitrator is fully compliant with the terms of the Plan itself, which expressly authorizes such a procedure. Section 8.3(b) of the Plan states:

> If the voting members of the Retirement Board are deadlocked with respect to a decision as to whether or to what extent any person is eligible for or entitled to benefits under this Plan, the Retirement Board may by an affirmative vote of three voting members submit such dispute for final and binding arbitration in accordance with the procedures and practices in use prior to the CBA.

Accordingly, the district court did not err by applying abuse of discretion review to the Retirement Board's 2011 benefits determination.

## 2. Consideration of Kasher's arbitration decision

Atkins argues that the district court erred by according deference to Kasher's arbitration decision and instead should have reviewed his decision *de novo*. Specifically, Atkins claims that because "[t]he plan did not grant Mr. Kasher discretion to decide benefit claims," the district court should not have treated Kasher's decision with deference by applying an abuse of discretion standard. Rather, because Kasher was not named as a fiduciary of the Plan, Atkins argues his decision should have been reviewed *de novo*.

Atkins' argument is misguided because it attempts to construe the Retirement Board's appointment of Kasher in an overly narrow and mechanical way. Atkins focuses on the absence of explicit documentation from the Board's meetings that he claims was required to grant Kasher the discretion to decide benefit claims by being officially designated as a Plan fiduciary. He also takes issue with the absence of specific meeting minutes reflecting the Board's adoption of Kasher's decision. Without such explicit documentation, Atkins argues that the Retirement Board improperly delegated the benefits determination to a non-fiduciary, and he cites several cases for the proposition that when an ERISA plan allows a benefits decision to be made by a non-fiduciary, the court reviews the benefits decision *de novo*.

Atkins is correct to the extent that this circuit has stated that only decisions by Plan fiduciaries and administrators that have been given discretionary authority are accorded deference and reviewed under an abuse of discretion standard. If no discretionary authority is given, *de novo* review is proper. *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 599–600 (5th Cir. 1994) (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 115). However, this circuit has also held that as long as a company or plan maintains control of the ultimate decision on benefits, it can rely on experienced agents to assist in the determination and the decision will still be reviewed under an abuse of

discretion standard. *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir. 1992).

The problem with Atkins' argument is that it ignores this subtlety in conjunction with the plain language of the Plan. The Board did not delegate the ultimate decision on benefits but instead used its discretion under the plan to utilize Kasher to break a deadlock, as established under the terms of the Plan and in compliance with ERISA. Section 8.3(b) of the Plan provides for the exact process the Retirement Board used in selecting Kasher to arbitrate Atkins' request for reclassification that resulted in a deadlocked Board. "If the voting members of the Retirement Board are deadlocked with respect to a decision as to whether . . . any person is eligible for . . . benefits under this Plan, the Retirement Board may . . . submit such dispute for final and binding arbitration . . . ."

This language complies both with the statutory requirements that an ERISA plan must designate an impartial process by which to resolve deadlock scenarios, and with precedent that affords deference to plan administration decisions, provided the benefit plan grants discretionary authority to determine eligibility for benefits, including the use of an arbitrator to resolve deadlock scenarios. With respect to payments of benefits, the Taft-Hartley Act permits an ERISA plan with both employee and employer representatives to utilize an impartial third party to break a deadlock. "[U]pon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute . . . ." 29 U.S.C. § 186(c)(5)(B). Section 8.3(b) of the Plan explicitly provides for this scenario.

Similarly, the Supreme Court and this court have reinforced the propriety of plan administrators' utilization of a neutral arbitrator to break a deadlock

without concerns over the mechanical procedures of formally designating the arbitrator as a fiduciary. "[I]n the adjustment of employee grievances against the employer . . . a trustee deadlock over eligibility matters, like any other deadlock, *must* be submitted to the compulsory resolution procedure established by § 302(c)(5) [of the Taft-Hartley Act]." *N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 338 (1981) (emphasis added) (wherein § 302(c)(5) of the Taft-Hartley Act refers to 29 U.S.C. § 186(c)(5)). This court has reached the same conclusion, holding that when ERISA plan trustees are given the power to consider adjustments to the level of benefits for a plan's beneficiaries, and are also empowered to refer a deadlocked decision to arbitration, plan trustees are acting within their powers when utilizing a neutral arbitrator. *Hauskins v. Stratton*, 721 F.2d 535, 537 (5th Cir. 1983). Therefore, despite Atkins' arguments to the contrary, the district court did not err in using abuse of discretion instead of a heightened standard of review when considering Kasher's decision.

**3. Substantive review of the Retirement Board's 2006 and 2011 benefits determinations**

Lastly, Atkins challenges the district court's decision affirming the Retirement Board's 2006 and 2011 benefits determinations on the merits under the abuse of discretion standard. With respect to the Retirement Board's 2006 benefits determination that he was only eligible for Inactive T&P disability benefits, he asserts there was "no evidence to support [the] conclusion" that his disability "was caused by psychiatric impairments that had no connection to his football career." He also argues that the Board's 2011 benefits determination was an abuse of discretion "due to the combination of insubstantial evidence and plan and procedural violations."

Given the deferential standard of review, Atkins' argument that the Board's 2006 benefits determination was an abuse of discretion is without merit. While Atkins claims the Retirement Board abused its discretion by "cherry

picking" and "extracting" particular findings from the reports of doctors Boll and Kesler, these allegations view the assembled evidence too narrowly.

By the time the Retirement Board made its benefits determination in 2006, it had Atkins' application for benefits and the examination findings of five doctors: Kesler, Souryal, Williamson, Martin, and Boll. Viewing the doctors' opinions in the aggregate, there is no conclusive result regarding whether Atkins was or was not totally disabled, and if he was, whether his disability arose from football activities.

Two doctors appear to support Atkins' view of his disability, at least in part. Kesler reported that Atkins was totally disabled but his conclusions on the basis for total disability were mixed, noting that it could not be determined if his cognitive issues were football related while finding Atkins' chronic pain and possible neurologic defects were football related. Similar to Kesler, Martin found that Atkins was totally disabled from a combination of issues, noting that Atkins' physical impairments were the result of football but the source of his cognitive issues was unknown. Martin also suggested further neuropsychological testing to better understand the source of Atkins' impairments.

On the other hand, the other three doctors' opinions support the Plan's decision, at least in part. Souryal noted that Atkins suffered from neck and shoulder impairments but concluded that he was not totally disabled. Similarly, Williamson concluded that Atkins had neck and shoulder issues resulting from football but that he was not totally disabled. Finally, Boll reported that Atkins was totally disabled and that he suffered from pain as a result of football but that his primary difficulties stemmed from psychiatric issues that were not the result of football.

Given this set of mixed medical opinions and a standard that requires us to uphold a plan's benefits determination absent an abuse of discretion, we must affirm the district court's judgment affirming the Retirement Board's decision

to award Inactive benefits. While we are sympathetic to Atkins' plight, the Board's decision does not meet the standard for an abuse of discretion given the mixed collection of evidence that could have been construed to support an award of either Inactive *or* Football Degenerative benefits. The Board's decision was far from "arbitrary" under the standard set forth in *Holland v. International Paper Co. Retirement Plan*, which would mean that the Board made its decision "without a rational connection between the known facts and the decision or between the found facts and the evidence." 576 F.3d at 246. The mixed bag of medical opinions simply do not provide a clear answer as to whether Atkins' disabling injuries did or did not arise from football and therefore the Retirement Board's discretion cannot be termed an abuse of discretion.

The Retirement Board's 2011 decision to adopt the arbitration decision by Kasher also does not meet the abuse of discretion standard. Like the 2006 benefits determination, Kasher had a mixed set of doctors' reports before him when determining if Atkins could demonstrate changed circumstances by clear and convincing evidence in support of his request to be reclassified to Football Degenerative benefits. In addition to the inconclusive doctors' reports from the 2006 determination, Kasher noted that Gilbert concluded that Atkins' impairments resulted from football but that he was not totally disabled. Gordon on the other hand concluded that while Atkins was totally disabled, two of the three bases upon which he found Atkins disabled were only "in part" the result of football. And finally, while Kasher acknowledged the Social Security Administration's finding of disability and Cantu's findings that Atkins was "probably beyond [post-concussion syndrome] into early traumatic encephalopathy," he also explained that these findings failed to meet the high bar of clear and convincing evidence for changed circumstances required for a benefits reclassification. Therefore, while Atkins' claim fell into the realm of "probability," the evidence was insufficient for granting Atkins' claim.

No. 11-51202

Like the 2006 benefits determination, Kasher's decision and the Retirement Board's adoption thereof in 2011 do not reach the level of arbitrary and capricious that is required for reversal under an abuse of discretion standard. While Atkins argues the 2011 decision was predicated on "insubstantial evidence," his claim is not supported by the record evidence and is without merit in light of the deferential standard of review that requires the court to affirm the Board's decision given "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis*, 394 F.3d at 273.

## CONCLUSION

We AFFIRM the district court's grant of summary judgment in favor of the Plan.