# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 26, 2026

Lyle W. Cayce
Clerk

———————

No. 25-20113

———————

Brad Miller,

*Plaintiff—Appellant*,

*versus*

Anadarko Petroleum Corporation Change of Control Severance Plan; Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:23-CV-3034

———————————————————————

Before Jones and Engelhardt, *Circuit Judges*, and Summerhays, *District Judge*.[*]

Edith Hollan Jones, *Circuit Judge*:[**]

Appellant Miller worked for Anadarko Petroleum Corporation ("Anadarko") for around thirty-five years.  In August 2019, Occidental

———————————————

[*] United States District Judge for the Western District of Louisiana, sitting by designation.

[**] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 25-20113

Petroleum Corporation ("Oxy") acquired Anadarko. Following the change in leadership, Miller sought separation benefits under a severance plan to no avail. Miller then sued for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, but the district court granted summary judgment to Anadarko. For the reasons that follow, we AFFIRM.

## BACKGROUND

In 1985, Miller joined Anadarko. He climbed the corporate ladder by becoming the Director of Strategic Planning in 2014; the Business Advisor to the International, Deepwater, Major Projects and HSE Executive Vice President in 2016; and the Director of Regulatory Affairs and Advocacy for the Gulf of America group in March 2018.

In 1998, Anadarko's Board of Directors created the "Anadarko Petroleum Corporation Change of Control Severance Plan" (the "Plan") "to provide severance compensation for its eligible employees." The Plan entitles Anadarko employees to separation benefits if a "Change of Control" occurs, and the employee resigns or is terminated under certain circumstances, including for "Good Reason." To be eligible for separation benefits, an employee who resigns for "Good Reason" must do so within ninety days of the event that caused the "good reason." The Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee ("Committee") handles the claims of employees who seek separation benefits under the Plan.

In August 2019, Oxy entered into a merger agreement with Anadarko and ultimately acquired the company. The acquisition qualified as a "Change of Control" event under the Plan.

After the acquisition, Miller continued working for Oxy. But he asserts his position steadily diminished. He ostensibly lost hiring and firing

authority in October 2019.  In December 2019, Oxy allegedly removed him from his leadership position on the Gulf of America Management Committee and no longer authorized him to provide input at the committee's staff meetings, although he could still attend.  Miller also contends that he was excluded from the annual performance reviews, merits discussions, and the bi-weekly Gulf of America strategy meetings that discussed special initiatives, strategic initiatives, forecasting decisions, personnel decisions, and process improvement initiatives.  Miller further states that he lost authority to approve trade organization alliances to Tom Janiszewski, Oxy's Vice President of Land.  Finally, Oxy removed him as a voting member of the API Drilling, Production, and Operations Subcommittee.

In March 2020, he allegedly lost 99% of his expenditure authority.  In April 2020, Oxy reduced his salary by 4.9% and either reduced or eliminated other additional benefits.  A month later, Andy Kershaw, the EVP of Offshore for Gulf of America Management, purportedly encouraged Miller to retire because having "older legacy Anadarko employees" retire would "make room for younger workers."  According to Miller, Kershaw also indicated that retirement might protect Miller's pension because Oxy might seek bankruptcy protection.

Because of these changes, Miller submitted a Good Reason Inquiry Form on May 19, 2020, seeking separation benefits under the Plan.  He stated that he suffered a "Good Reason" event on March 31, 2020, because Oxy materially and adversely diminished his duties and responsibilities and materially reduced his salary by 4.9%.  More specifically, Miller stated that Oxy reduced his responsibilities by (1) lowering his spending approval authority from $4 million to $12,500; (2) reducing the number of employees reporting directly to Miller and the members of his team; (3) moving employees out of Miller's team and authority; and (4) indicating that Oxy was trying to replace him with Robbie Abraham, an Oxy employee who

attended Skype meetings and allegedly called Miller's team members to demand information from them and assign them work. Miller's form specifically referenced the retirement conversation with Kershaw and alleged that "Oxy [wa]s forcing out older Anadarko workers."

When Miller opted to resign on June 19, 2020, the Committee agreed to treat his good reason inquiry as a formal claim for benefits under the Plan.

Almost a year later, the Committee sent a letter to Miller denying his claim for separation benefits on the basis that a good reason event had not occurred. The Committee reasoned that Oxy had neither materially and adversely diminished his duties and responsibilities nor materially reduced his salary.

Miller appealed to the Committee. According to Miller, "the denial was premised on several false representations . . . and . . . no documentary evidence." But four months later, the Committee supplied even more detailed explanations for its decision.

Still dissatisfied, Miller sued the Committee and the Plan based on a denial of benefits claim under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), and for breach of fiduciary duty under ERISA Section 404(a), 29 U.S.C. § 1104(a). Following discovery and cross-motions for summary judgment, the district court granted summary judgment to the Plan and the Committee but denied it as to Miller. The district court determined that an abuse of discretion standard of review applied, and the Committee committed no such abuse in finding no good reason event. Miller appealed.

## STANDARD OF REVIEW

This court "review[s] a district court's grant of summary judgment in ERISA cases de novo, applying the same standards as the district court." *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 250

(5th Cir. 2019) (italics omitted). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Whether the district court employed the appropriate standard in reviewing an eligibility determination made by an ERISA plan administrator is a question of law that we review de novo." *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (internal quotation omitted).

## DISCUSSION

Miller challenges both the abuse of discretion review standard employed by the district court and the Committee's denial of separation benefits to Miller under the Plan. We take the issues in turn.

### I.

Miller initially contends that the district court was obliged to review the Committee's decision de novo rather than for abuse of discretion. The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989) (italics omitted). In the latter instance, "a plan's eligibility determination must be upheld by a court unless it is found to be an abuse of discretion." *Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 694 F.3d 557, 566 (5th Cir. 2012) (citing *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 111, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008)). And "'with or without a discretion clause, a district court rejects an administrator's *factual* determinations in the course of a benefits review only upon the showing of an abuse of discretion.'" *Green*, 754 F.3d at 329 (emphasis added) (quoting *Dutka ex rel. Est. of T.M. v. AIG Life Ins.*, 573 F.3d 210, 212 (5th Cir. 2009)).

No. 25-20113

The Plan's text here shows that the Committee has interpretive discretion. Section 9.3(g) of the Plan states that "[t]he Plan *shall be interpreted by the Committee* in accordance with the terms of the Plan and their intended meanings." It also states that the Committee "*shall have the discretion to interpret or construe* ambiguous, unclear or implied (but omitted) terms *in any fashion that the Committee deems to be appropriate in its sole judgment*." This grant of interpretive discretion to the Committee requires a court to apply the abuse of discretion standard. The Plan reinforces the administrators' discretion in further stating that "[t]he validity of any such finding of fact, interpretation, construction or decision shall *not* be given de novo review if challenged in court, by arbitration or in any other forum, and shall be upheld unless clearly arbitrary or capricious."

Miller, however, contends that de novo is the proper standard because it is the default rule; the Plan's terms give the Committee interpretive discretion only for ambiguous or unclear terms, not unambiguous ones; and what counts as "Good Reason" is unambiguous under the Plan.

Miller's interpretation falls short in two ways. First, although Section 9.3(g) of the plan appears to limit the Committee's discretion to ambiguous terms only, the last sentence of that subsection states that "Section 9.3 may not be invoked by any person to require the Plan to be interpreted in a manner *which is inconsistent with its interpretation by the Committee*." Adopting Miller's de novo rule of interpretation would render this provision meaningless because it would be "inconsistent with [the] interpretation by the Committee." And meaningless provisions signal mistaken interpretations. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174–79 (2012).

Second, Miller wrongly contends that "Good Reason" is a clear and unambiguous term. To be sure, the Plan defines "Good Reason" as those "occurrence[s]" where, among other things, the employee's responsibilities and duties are "materially and adversely diminished in comparison to the duties and responsibilities enjoyed . . . immediately prior to the Change of Control"; and the employee's "Base Salary is materially reduced in comparison to the Base Salary enjoyed . . . immediately prior to the Change of Control." Finding "material and adverse" diminutions in employee responsibilities and "material reductions" in salary demands fact-bound and judgmental decisions. These ingredients of "good reason" require comparisons and the weighing of several factors. Thus, the global application of "Good Reason" is ambiguous, as it is clearly intended to be by the Plan, and the Committee has discretion to enforce it.

Two unpublished and nonprecedential decisions have some bearing on this case because they interpret the same Anadarko Plan. We are bound by neither, of course. In *Gift v. Anadarko Petroleum Corp. Change of Control Severance Plan*, this court concluded that the district court correctly used the abuse of discretion standard. *See* No. 23-50862, 2024 WL 4689051, at *1–2 (5th Cir. Nov. 6, 2024) (per curiam) (concluding that the Plan conferred discretionary authority). Contrary to Miller's contentions, the plaintiff in *Gift* challenged the abuse of discretion standard used by the district court despite agreeing that the Plan conferred discretion, *id.* at *1, and the court addressed the application of the Good Reason provision.

The Tenth Circuit, however, addressed the same Plan at issue here but reached the opposite conclusion. *See Hoff v. Amended & Restated Anadarko Petroleum Corp. Change of Control Severance Plan*, No. 23-1361, 2025 WL 400517, at *4 (10th Cir. Feb. 4, 2025). The *Hoff* court concluded that de no review applied because the Plan only provided deference to "ambiguous, unclear[,] or implied (but omitted) terms," but neither party

argued that "Good Reason" was ambiguous. Unlike *Hoff*, this case hinges on the parties' disagreement over the meaning and application of the "Good Reason" provision. Further, while *Hoff* supplied standard dictionary definitions for "material" and "adverse," those definitions add little if any clarity as to what specific circumstances are "material" and "adverse." *Hoff* added that the examples in Anadarko's guidance documents supported the plaintiff's views there, *see id.* at *5, but Miller has not shown how Anadarko's Summary Plan Description or guidance examples supported his view here. Neither case measurably changes our conclusion that abuse of discretion review was required because the Committee exercised discretion in interpreting the Plan.

## II.

Miller contends that the Committee abused its discretion in rejecting his claim that a Good Reason event occurred. Generally, "[a] plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *George v. Reliance Standard Life Ins.*, 776 F.3d 349, 353 (5th Cir. 2015) (internal quotation omitted). This standard "requires only that substantial evidence supports the plan fiduciary's decision." *Atkins*, 694 F.3d at 566. Substantial evidence is well settled to be "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 95 F.4th 964, 971 (5th Cir. 2024) (internal quotation omitted), *cert. denied*, 145 S.Ct. 271 (2024). Moreover, "[a] decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Id.* (internal quotation omitted).

Miller argues that the Committee abused its discretion in three ways. First, the Committee disregarded his conversation with Kershaw and Kershaw's "ultimatum" of resigning now or losing his pension later because of Oxy's allegedly impending bankruptcy. Second, the Committee ignored his unique authority over trade association relationships. Third, the Committee erroneously equated mere exposure to leadership with actual authority when it "relegated [Miller] to a larger group where his role was observational at best, with no distinct authority or impact," and "disregard[ed] the substance of Miller's diminished role."

Miller is wrong on all points. First, the Committee did not disregard his allegations concerning Kershaw. Instead, the Committee relied on information from Oxy's human-resources department, concluded that Miller's supervisor age discrimination claims regarding Kershaw were unsubstantiated, and cited caselaw for the proposition that more investigation was not required. At bottom, that response to Miller's contention "falls somewhere on a continuum of reasonableness—even if on the low end." *Cloud*, 95 F.4th at 971 (internal quotation omitted).

Second, the Committee far from ignored Miller's "unique authority" over trade association relationships. When addressing Miller's appeal of its initial denial, the Committee reviewed a letter from Miller's previous supervisor at Anadarko, Allen Sanders, that confirmed his pre-merger responsibilities. Sanders stated that "trade organizations represented key business relationships," and Miller was responsible for "obtain[ing] approvals and approv[ing] invoices for payment, report[ing] on analysis[,] and provid[ing] recommendations regarding continued relationships." The Committee interviewed Kershaw, Miller's supervisor at Oxy, concerning the claim that his unique authority was transferred to Tom Janiszewski, the Vice President of Land. Kershaw explained that Oxy transferred the trade association relationships to Janiszewski because they were more aligned with

his responsibilities and immaterial to Miller's responsibilities. Further, Oxy discontinued the trade-association relationships anyway because of the pandemic. Sanders and Kershaw seem to disagree on the importance of working with trade organizations, but the fact that the Committee sided with Kershaw is not arbitrary or an abuse of discretion because this conclusion at least has "*a* rational connection between the known facts and the decision or between the found facts and the evidence." *Cloud*, 95 F.4th at 971 (internal quotation omitted) (emphasis added).

Finally, Miller's argument that the Committee conflated mere leadership exposure with actual authority is meritless. To ascertain whether Miller lost the ability to provide input or strategies on the Gulf of America Management Committee, the Committee interviewed, among others, Kershaw, Sanders, the former Vice President of Operations, and Patrick McGrievey, the former Director of Gulf of America Asset Development. Before Oxy acquired Anadarko, Sanders thought that Miller's involvement in the meetings was "beneficial," but he explained that Miller did not have direct responsibility for Gulf of America operations outside of regulatory matters. After the merger, Kershaw stated, Oxy did not remove Miller from the Gulf of America Management Committee. Oxy replaced that group with the Gulf of America Executive Leadership Team ("ELT"), a larger group that includes all groups working in the Gulf of America, including directors, drilling, legal, human resources, and others. And because ELT afforded a broader perspective and range of participants, Kershaw explained that Miller's participation in ELT gave him broader exposure and the ability to provide more significant input for the Gulf of America. For his part, McGrievey conceded that the meetings changed after Oxy took over, but because Miller was only responsible for regulatory matters, he was not sure whether Miller would even be able to provide input in other committee meetings.

In light of this evidence, the Committee determined that Miller's duties and responsibilities were not diminished because his participation in ELT was actually "more expansive" than in the previous committee. Moreover, this experience gave him broader exposure to other parts of management, operations, and executive leadership for the Gulf of America. Accordingly, the testimony of three witnesses shows that the Committee's conclusion is "based on evidence, even if disputable, that clearly supports the basis for its denial," *George*, 776 F.3d at 353, and the evidence bears "*a rational connection between the known facts and the decision or between the found facts and the evidence*," *Cloud*, 95 F.4th at 971 (emphasis added).

## CONCLUSION

Miller received full and conscientious consideration of his claim for benefits under the Plan in accordance with ERISA standards. For the above reasons, the court AFFIRMS the district court's judgment.