**AFFIRM in Part, REVERSE and RENDER; Opinion Filed September 15, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00394-CV

### B & S WELDING LLC WORK RELATED INJURY PLAN, Appellant
### V.
### JUAN PEDRO OLIVA-BARRON AND AVELINA OLIVA, Appellees

**On Appeal from the 95th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 09-12619**

## OPINION

Before Justices O'Neill and FitzGerald[1]
Opinion by Justice O'Neill

After concluding that appellant B & S Welding LLC Work Related Injury Plan (the Plan) wrongfully denied benefits to appellee Juan Pedro Oliva-Barron (Oliva), the trial court rendered judgment in Oliva's favor. The Plan appeals, alleging the trial court erred in its review of the Plan's decision to terminate Oliva's benefits and in its award of attorney's fees to Oliva. We conclude the Plan's decision to terminate Oliva's benefits was not supported by substantial evidence. We further conclude that there was no evidence to support one of the damage awards made by the trial court. We therefore affirm the trial court's judgment in part and reverse in part.

---

[1] The Honorable Jim Moseley was on the panel and participated at the submission of this case. Due to his retirement from this Court, he did not participate in the issuance of this Opinion. *See* TEX. R. APP. P. 41.1(a), (b).

## BACKGROUND

Oliva was injured at work on June 24, 2009, and received medical and indemnity benefits from the Plan. Three months after the injury, the Plan brought this suit against Oliva and his wife Avelina Oliva for fraud, conspiracy to commit fraud, and unjust enrichment. The Olivas then filed a third-party claim against Oliva's former employer, B & S Welding, LLC (Employer), and counterclaimed against the Plan for unpaid medical and indemnity benefits.

The trial court tried the case in two phases. The Plan's claims against the Olivas and the Olivas' claims against the Plan under the Employee Retirement Income Security Act of 1975 (ERISA), 29 U.S.C. §§ 1001–1461 (2012), were tried to the court. The Olivas' claims against Employer were tried to a jury. The jury made findings in favor of Employer. The trial court found in favor of Oliva on his claims against the Plan, and dismissed the Plan's claims against the Olivas. The trial court rendered judgment in favor of the Olivas and Employer. The trial court also made findings of fact and conclusions of law in support of its judgment.

In this appeal, the Plan alleges error with respect to the trial court's rulings on the Olivas' claims against it. The Plan does not appeal the portion of the trial court's judgment dismissing its claims against the Olivas, and the Olivas do not appeal the portion of the judgment dismissing their claims against Employer.

## DISCUSSION

In its first issue, the Plan contends that the Olivas failed to exhaust their administrative remedies before asserting their claims in the trial court. In its second issue, the Plan complains of the trial court's conclusion that the Plan's administrator abused its discretion in terminating Oliva's benefits. In its third issue, the Plan argues that there is no evidence to support the trial court's award of damages and attorney's fees to the Olivas. Two different standards of review apply to the Plan's issues. We discuss the applicable standards of review in our consideration of each issue.

### A. Exhaustion of Remedies

In general, a claimant seeking benefits from an ERISA plan must first exhaust available administrative remedies under the plan before bringing suit to recover benefits. *Bourgeois v. Pension Plan for Emps. of Santa Fe Int'l Corps.*, 215 F.3d 475, 479 (5th Cir. 2000). However, a plaintiff may be excused from exhausting administrative remedies under ERISA if it would have been futile to do so. *See Denton v. First Nat'l Bank of Waco, Texas*, 765 F.2d 1295, 1302 (5th Cir. 1985). In Finding of Fact 27, the trial court found, "Oliva was not required to exhaust administrative remedies under the Plan because, among other reasons, the Plan's actions in suing the Olivas exhibited baseless hostility; any administrative appeal for the denial of benefits would have been futile. Furthermore, by its actions the Plan waived, or is estopped from asserting, any exhaustion requirements."

In its first issue, the Plan argues that there was no evidence to support the trial court's finding. In an appeal from a bench trial, we review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards used when determining if sufficient evidence exists to support an answer to a jury question. *Fulgham v. Fischer*, 349 S.W.3d 153, 157 (Tex. App.—Dallas 2011, no pet.). When the appellate record contains a reporter's record as it does in this case, findings of fact are not conclusive on appeal if the contrary is established as a matter of law or if there is no evidence to support the findings. *Brockie v. Webb*, 244 S.W.3d 905, 908 (Tex. App.—Dallas 2008, pet. denied). Similarly, unchallenged findings of fact are binding on an appellate court unless the contrary is established as a matter of law or if there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

When an appellant challenges the factual sufficiency of the evidence on an issue, we consider all the evidence supporting and contradicting the finding. *Fulgham*, 349 S.W.3d at 157

(citing *Plas-Tex,, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989)). We set aside the finding for factual insufficiency only if the finding is so contrary to the evidence as to be clearly wrong and manifestly unjust. *Id.* (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)). In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses. *Id.* As long as the evidence falls "within the zone of reasonable disagreement," we will not substitute our judgment for that of the fact-finder. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). A challenge to the legal sufficiency of the evidence fails if more than a scintilla of evidence exists to support the finding. *Brockie*, 244 S.W.3d at 909.

We review the trial court's conclusions of law de novo. *Fulgham*, 349 S.W.3d at 157. We are not bound by the trial court's legal conclusions, but the conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Id.* at 157–58. Incorrect conclusions of law will not require reversal if the controlling findings of fact will support a correct legal theory. *Id.* Conclusions of law may not be reversed unless they are erroneous as a matter of law. *Id.*

The Plan makes several arguments in support of its challenge to the sufficiency of the evidence to support the trial court's finding of futility. The Plan argues there is no evidence of the hostility, bitterness, or bias necessary to establish futility. The Plan also contends there is no evidence of any exceptional circumstances to show that requiring the Olivas to follow the appeal process mandated by the Plan would be futile. It argues the Olivas failed to demonstrate "certainty" that the benefits would be denied on administrative appeal. And the Plan contends there is no evidence that the Olivas were denied "meaningful access to the Plan's administrative remedies."

We conclude there is sufficient evidence to support the trial court's finding that an administrative appeal would have been futile. The trial court's unchallenged findings recite the

–4–

sequence of events. On June 24, 2009, Oliva was "seriously injured" when "he fell 15 or more feet onto hardened concrete," and suffered a fractured right wrist, compression fractures in his thoracic spine, injury to his left wrist, and bruising and injury to other parts of his body, including his sacrum.

Oliva's fall occurred on a job site in Oklahoma City. He was discharged from the hospital in Oklahoma prior to surgery that had been scheduled on his right arm, and he returned to Dallas by private car. The Plan designated Dr. Bryan S. Drazner as Oliva's treating physician. The Plan also referred Oliva to a hand surgeon, who recommended immediate surgery on June 30, and to an orthopedic surgeon, who determined on July 17 that Oliva was suffering from two compression fractures in his spine. Shortly after the injury, the Plan began video surveillance on Oliva.

Oliva was subjected to multi-hour waits each time he went to see Dr. Drazner. Oliva consulted an attorney on July 28 to determine if he could change treating physicians. The "case manager" hired by the Plan noted that the Olivas had seen an attorney. On August 5, the Plan attempted to obtain a release of claims from Oliva by summoning him to a meeting at a hotel where he was unrepresented by counsel. The Olivas, non-English speakers, were told that if they did not sign the release, "things will change," or words to that effect. Oliva refused to sign the release because the full extent of his injuries were not known.

The Plan filed this suit on September 18, 2009, less than three months after Oliva's fall and the same day Oliva's attorney sent a representation letter to the Plan. Claims were filed against both Oliva and his wife, although it is undisputed that his wife received no Plan benefits. In its Petition, the Plan averred that Oliva was "allegedly" injured; he "grossly exaggerate[d]" his "purported need for medical benefits" and had "attempted to continue and increase those benefits" even though they were "no longer justified or necessary." The Plan alleged that

–5–

Avelina Oliva "is complicit in assisting" Oliva "in exaggerating and creating alleged maladies and in obtaining benefits from the Plan to which he is not entitled given his actual medical condition." The factual allegations conclude, "[c]learly, Defendants have, and continue to, obtain health care treatment and disability payments at the Plan's expense under false pretenses. Such conduct amounts to conspiracy to commit fraud at the most and at the very least results in Defendants' unjust enrichment for the receipt of benefits and monies to which they are not entitled." The Plan asserted causes of action for fraud, conspiracy to commit fraud, and unjust enrichment, and sought actual and exemplary damages.

Only after suit was filed, some ten days later, did the Plan serve its notice of adverse benefit determination on Oliva and his attorney. The letter stated in part, "you have set about to defraud the Plan of benefits and have consistently misrepresented your physical condition, been untruthful to the Plan Administrator and have conspired with others to assist you in this conduct."

In support of its argument that Oliva was required to exhaust administrative remedies, the Plan argues "[a]t most, the evidence shows that Pedro's benefits were denied after an investigation, which also occurred after settlement discussions with [Employer] failed," and contends there is no evidence "to causally connect" Oliva's refusal to sign the release with the Plan's lawsuit and denial of benefits. The Plan also argues that "the Olivas presented no evidence at all regarding what would occur if the denial of benefits had been appealed." The record shows, however, that rather than presenting to Oliva the reasons for denying his claim and allowing time for appeal, the Plan filed suit alleging fraud and seeking damages even before any formal denial of Oliva's claim. The Plan cites authority that exhaustion of remedies is required except in "exceptional circumstances." *See, e.g., Commc'ns Workers of Am. v. AT&T*, 40 F.3d 426, 431–32 (D.C. Cir. 1994). The Plan does not cite any case, however, in which a plan first

sued the claimant for fraud, conspiracy, and unjust enrichment arising from the same injury and benefits determination, and the claimant sought benefits only as a counterclaim. Oliva's defenses to the lawsuit and his grounds for administrative appeal would rely on the same facts, including his actual medical condition, his compliance with the Plan, and representations he made to the Plan. If an administrative appeal was required under these circumstances, the Plan would be attempting to act as an unbiased tribunal for Oliva's appeal at the same time as it was actively litigating a contrary position in court. The trial court did not abuse its discretion in finding that such an appeal would be futile. We decide the Plan's first issue against it.

## B. Termination of Benefits

We review de novo the trial court's application of the appropriate standards of review to be applied to an ERISA administrator's benefits determination. *Phillips v. Metro. Life Ins. Co.*, 405 S.W.3d 880, 891 (Tex. App.—Dallas 2013, no pet.). Here, the trial court's conclusions of law apply an "arbitrary and capricious" or "substantial evidence" standard. The standard of review is dependent on the language of the controlling plan. *Id.*

The applicable language is found in Article 10.1(b) of the Plan. Article 10.1(b) provides in relevant part that the Plan administrator has "discretionary and final authority to interpret and implement the provisions of the Plan, including, but not limited to, making all factual and legal determinations, correcting any defect, reconciling any inconsistency and supplying any omission, and making any and all determinations that may impact a claim for benefits hereunder."[2] Because the Plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the Plan's terms, the trial court and this Court on de novo review consider the administrator's determinations for an abuse of discretion. *Phillips*, 405 S.W.3d at 891–92

---

[2] Article 10.1(b) also provides, "There shall be no de novo review by any arbitrator or court of any decision rendered by the Committee and any review of such decision shall be limited to determining whether the decision was so arbitrary and capricious as to be an abuse of discretion."

(citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). As explained in *Anderson v. Cytec Industries, Inc.*, 619 F.3d 505, 511–12 (5th Cir. 2010) (per curiam), we review de novo the district court's conclusion that an ERISA plan administrator abused its discretion in denying benefits, and in doing so review the plan administrator's decision from the same perspective as the district court; here, for abuse of discretion.

The abuse of discretion standard in the ERISA context "is synonymous with arbitrary and capricious review." *Phillips*, 405 S.W.2d at 891–92 (citing *Cooper v. Hewlitt-Packard Co.*, 592 F.3d 645, 652 (5th Cir. 2009)). Under this standard, the plan administrator's decision must be supported by "substantial evidence." *Id.* (citing *Atkins v. Bert Bell/Pete Rozell NFL Player Ret. Plan*, 694 F.3d 557, 566 (5th Cir. 2012)). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Atkins*, 694 F.3d at 566) (internal quotes omitted). A decision is arbitrary if it is made "without a rational connection between the known facts and the decision or between the found facts and the evidence." *Id.* (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)). Our review of the administrator's decision is not complex or technical; we must assure the decision "'fall[s] somewhere on a continuum of reasonableness—even if on the low end.'" *Id.* (quoting *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007)).

Under an abuse of discretion standard, our review of the plan administrator's determinations is limited to the administrative record. *Id.* We may consider only the actual basis on which the administrator denied the claim, not "post-hoc rationalizations." *Id.* at 891–92. (quoting *Koehler v. Aetna Health Inc.*, 683 F.3d 182, 190 n.18 (5th Cir. 2012)). Standard evidentiary rules do not apply to the claim administrator's benefits determinations; in assessing the reasonableness of the administrator's decision, we review the entire administrative record,

including hearsay evidence relied on by the administrator. *Id.* at 892. The administrative record "consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299–300 (5th Cir. 1999) (en banc), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Here, because the Plan brought suit against Oliva before it notified him of the denial of benefits and before any opportunity for administrative appeal arose, there is no administrative record. At trial and in this appeal, the Plan relies on two items to support its determination: (1) progress reports prepared by Maggie Davis, a nurse case manager for Review Med, a case management company hired by Process One TPA, the third-party administrator for the Plan, and (2) surveillance video taken of Oliva between the date of his injury and the date of denial.

There is no question that Oliva fell from a height (the record varies from approximately fifteen to thirty feet) on to concrete. The record is undisputed that this fall could have been fatal, and that Oliva suffered a fractured wrist, fractured spine, and severe bruising. The record is undisputed that Oliva required surgery on his wrist and treatment and rehabilitation for his other injuries, including a back brace and a walker. The record shows that even the Plan's treating doctor did not expect Oliva to return to work for four to six months. The record is also undisputed that Oliva refused to sign a release of claims proffered to him by the Plan and his Employer approximately six weeks after his injury. The Plan thereafter reduced the amount of benefits paid to Oliva, and filed suit before any formal denial of benefits had been made, on the day Oliva's lawyer sent the Plan a notice of representation.

Ten days after filing suit, the Plan sent a notice of adverse benefit determination denying Oliva's continuing eligibility for benefits under the Plan as of September 14, 2009. One paragraph of the letter addressed the Plan's reasons for the denial of benefits:

> According to our file documentation and upon information and belief, you have set about to defraud the Plan of benefits and have consistently misrepresented your physical condition, been untruthful to the Plan Administrator and have conspired with others to assist you in this conduct. Thus, you have violated and/or failed to comply with the Plan provisions outlined above. In addition, you achieved maximum medical improvement on September 14, 2009. You have been released to return to work as of September 14, 2009 and have failed to do so. In fact, you have failed to even advise your employer that you have been released to work. You have failed or refused to follow the treatment plan and recommendations of Dr. Drazner and medical personnel to whom he has referred you. Since you have not complied with the terms and provisions of the B&S Welding LLC Work Related Injury Plan, your claim and continuing eligibility are denied.

The letter was written by Kevin M. Golliglee of Process One. In its reply brief, the Plan confirms that "Process One employee Kevin Golliglee administered the Plan on the Plan's behalf." The letter does not identify any specific record that supports the determination, and Golliglee did not testify at trial. But the Plan contends that Davis's progress notes and the surveillance video provide a reasonable basis for the denial.

Although the Plan chose Dr. Drazner as Oliva's treating physician and relies on Davis's summary of Oliva's appointments with Dr. Drazner, Dr. Drazner's records are not included in the record. Davis's reports reflect that Oliva saw Dr. Drazner on June 29, July 8, July 22, August 5, September 2, September 9, and September 14, 2009. Davis's notes include Dr. Drazner's initial estimate of time for Oliva's recovery. Her entry for July 8, 2009, states that "Dr. Drazner provided the claimant and his family with an extensive explanation of the mechanism of the injuries and the possible treatment plans and the expected time frame for recovery and RTW [return to work] of four to six (4–6) months."

Dr. Drazner was deceased at the time of trial. The Plan retained Dr. James A. Scott in August 2011 to provide an expert opinion regarding Oliva's medical treatment. Dr. Scott testified that he reviewed records of Oliva's June 29, July 8, and July 22 appointments with Dr.

Drazner, but was not provided, and has never seen, any records from any subsequent appointments.[3] Dr. Scott conceded that his opinions would not have been available to the Plan at the time it denied benefits to Oliva, as he was not retained until two years later.

At trial, Oliva's medical records from his initial treatment at OU Medical Center were admitted into evidence. Records from North Central Surgical Center, where Oliva's wrist surgery was performed by Dr. Thomas Diliberti, and from Texas Spine Consultants, where Oliva was treated for his spine fractures by Dr. Robert G. Viere, were also admitted into evidence at trial. Dr. Viere's deposition testimony is also included in the record.

The Plan's denial letter states that Oliva reached maximum medical improvement on September 14, 2009, and was released to return to work on that date. Davis's progress report for September 9, 2009, states that "Dr. Drazner also released the claimant to light duty work and informed the claimant that he should contact his employer to evaluate the availability of light duty work." Davis's entry for September 9 also reflects that Dr. Drazner will order "a Functional Capacities Evaluation (FCE) to evaluate his physical status and check his current work level." There is no FCE in the record, and no release to return to work.[4] Davis testified at trial that the FCE was completed and showed "positive findings for Waddell's," a test "to see if there's any chances of malingering or fabrication" of pain. According to Davis's notes from a final visit to Dr. Drazner on September 14, 2009, these results were explained to Oliva. Oliva was reportedly told that "due to the severe inconsistence [sic] and the inability of the claimant to put forth a

---

[3] Consistent with Dr. Scott's testimony, the clerk's record contains an affidavit by Dr. Drazner dated May 18, 2010, in support of a summary judgment motion not at issue in this appeal. Dr. Drazner's affidavit addresses only the three appointments on or before July 22, and a subsequent letter dated August 26, 2009, stating that a wheelchair was not medically necessary for Oliva. There is no reference to any appointment or treatment after July 22 even though the appointments would have taken place almost a year before the affidavit was signed. This affidavit would not have been part of any administrative record because it post-dates the decision to deny benefits by eight months.

[4] Although the exhibit volume of the reporter's record contains a "Texas Workers' Compensation Work Status Report" dated September 14, 2009, this exhibit was not signed by Oliva. In the blank for "employee's signature," "signature on file" is typed. No foundation was laid for the admission of this document into evidence at trial, and the trial court sustained Oliva's objection to its admittance. Although a plan administrator may rely on hearsay or other information that is inadmissible at trial in making a benefits decision, here there is no evidence that Golliglee ever saw or relied on this document, or that Oliva ever saw it or was asked to sign it. Golliglee did provide a business records affidavit for three pages of documents showing payments made relating to Oliva's injury, but made no statement about any other record relating to Oliva.

100% effort the carrier has stated therapy will no longer be authorized due to the lack of progress and effort," and "Dr. Drazner and case management are no longer approved to provide services to the claimant." Davis's notes end on the same day with closure of the case.

Davis's reports also indicate, however, that on Oliva's first visit to Dr. Diliberti on June 30, 2009, "Dr. Diliberti reported that surgical intervention was essential for the right arm immediately." Davis's reports, as well as Dr. Diliberti's records, show that Oliva's wrist was surgically repaired on July 1, 2009. Davis also reported that Oliva's wrist showed "adequate healing" at a follow-up appointment with Dr. Diliberti on July 14. Dr. Diliberti "stated that the claimant's right wrist should be recovered in six (6) weeks to begin lifting and carrying." Davis's reports, however, do not reflect further follow-up appointments with Dr. Diliberti or any release to return to work from him.

The Plan also authorized treatment for Oliva's back injury. Oliva first visited Dr. Viere on July 17, 2009. Dr. Viere's records reflect Oliva "has minimal compression fractures at T11 and T12 which should be adequately treated in a brace," as well as a hematoma. Dr. Viere stated that "I would anticipate these fracture[s] will take 2–3 months to heal before he can come out of brace," and noted that he "would like to see patient back in six weeks." Dr. Viere, a board-certified orthopedic surgeon, testified that at the first appointment, Oliva had "substantial" bruising that was "clearly visible," as well as swelling. Dr. Viere testified that he next saw Oliva on September 3, 2009. His records reflect that the bruising and swelling had improved but was still visible, and that the spine fracture had not yet fully healed. Oliva's third visit to Dr. Viere took place on October 9, 2009, several weeks after the Plan had terminated Oliva's benefits.

Dr. Viere testified that Oliva's fall could have been fatal. He also testified that he did not recall, or record, any exaggeration or magnification of symptoms by Oliva, and that Oliva cooperated with all directives given. He stated that from the date of the injury until Oliva's last

visit on October 9, he considered Oliva to be disabled. On cross-examination, he stated that he did not recommend any further treatment after October 9 for Oliva's compression fractures. He explained that he "felt that the bony fractures had healed," and "now it was a matter of . . . continuing his rehab process."

The Plan relies heavily on surveillance video excerpts shown at trial and included in the record. According to the Plan, these excerpts show that Oliva was misrepresenting the degree of his pain and physical capabilities to his doctors and to the Plan. Because Davis was unaware of the video surveillance, her records make no reference to it and she could not offer testimony about it at trial except to state that she knew of no medical reason why surveillance would have been necessary immediately upon Oliva's return to Dallas. Instead, the Plan showed the video excerpts in its cross-examination of Oliva. There was no evidence offered that Golliglee saw or relied on the video although the Plan contends he did. Oliva's employer Jo Anne Malicoat testified at trial that "[a]t some point, I believe while it was still going on, we were advised by Process One that that [video surveillance] was happening," and she received and "reviewed briefly" the videos after the surveillance was concluded. She did not know, however, "what impact those videos had on the benefits Mr. Oliva was receiving" under the Plan.

Oliva did not deny that he is the person portrayed in the video excerpts. The videos show Oliva climbing stairs, driving, walking without a brace or walker, and carrying groceries. They also show him using a brace, wheelchair, and walker when attending medical appointments on the same days as he performed tasks and walked without such assistance. Although Dr. Scott testified that there were hours of additional video surveillance, only the excerpts are included in the record. Dr. Scott offered the opinion that the video excerpts showed "a selective activity level based upon when it was about time to go in for medical treatment," and that Oliva was "feeling better and willing to do more physically when not in the medical environment." Dr.

Scott did not interview or examine Oliva. He testified that Oliva was not being truthful with his doctors about his physical condition and that the doctors would have no way to know Oliva's physical capabilities as shown on the video. Dr. Scott admitted that he had only a "vague idea" of the physical requirements of Oliva's job, and Oliva's abilities to lift groceries and walk as depicted in the video might not demonstrate the physical ability to do his job. He agreed that the video was not a substitute for a functional capacity evaluation of Oliva's ability to perform the tasks required for his job.

The Plan cites *Truitt v. Unum Life Insurance Co. of America*, 729 F.3d 497, 509 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1761 (2014), for the proposition that a plan administrator is not required to consider only medical records or admissible evidence, but may make a decision based on "relevant information," including video surveillance, and may make a decision based on conflicting information. In *Truitt*, however, "[t]he district court found, and the parties do not dispute, that there was substantial evidence to support [the] . . . decision to deny benefits." *Id.* Therefore, the only question presented in *Truitt* was whether Unum "otherwise abused its discretion in denying Truitt's benefits." *Id.*

Before any suit was filed in *Truitt*, a full administrative record was developed. *See id.* at 501–08, 512. Unum obtained a functional capacity evaluation, an independent medical examination, and surveillance videos before notifying Truitt in a twelve-page letter that it was terminating her disability benefits. *Id.* at 501–02. Truitt filed an administrative appeal, and a vocational specialist reviewed Truitt's file. Based on that review, Truitt's benefits were reinstated. Shortly thereafter, Unum was contacted by a man who had "been in a personal relationship" with Truitt. The man offered Unum 600 emails from a two-year period reflecting that Truitt was physically capable of extensive travel and other physical activities. *Id.* at 502–05. Unum then suspended Truitt's benefits and initiated further investigation. A Unum physician

–14–

and additional medical experts, including a physician and a vocational consultant, reviewed Truitt's file. In a fourteen-page letter, Unum gave Truitt notice that it was terminating her benefits. The letter cited Truitt's travel records, the surveillance video, the emails, medical reports, and vocational records to support its decision. *Id.* at 506. Truitt then filed a detailed appeal with additional expert reports, and Unum again reviewed her claim. *Id.* at 507. In a final letter, Unum upheld its decision to discontinue benefits and seek reimbursement for overpayments, "again detail[ing] the medical records, vocational reviews, and emails that supported its decisions." *Id.* The final decision was made after at least four years of investigation and administrative review. *See id.* at 501, 507.

The Plan relies heavily on *Truitt* to argue that its consideration of surveillance video and Davis's reports on Oliva's appointments with Dr. Drazner was sufficient to provide a reasonable basis for its decision. The Plan also relies on *Truitt* to argue that it had no duty to undertake any investigation before issuing its denial. *See id.* at 510 (citing *Vega*, 188 F.3d at 299, for the proposition that "the district court may not impose a duty to reasonably investigate on the administrator"). The Plan's termination of benefits and suit for fraud eleven weeks after Oliva's fall, without any opportunity for administrative review, however, stands in stark contrast to the years of investigation and review, including multiple medical and vocational evaluations, afforded the claimant in *Truitt* before the claimant, not the plan, brought suit. Although there may be no "duty to reasonably investigate" on the part of the Plan, there must be some "rational connection between the known facts and the decision or between the found facts and the evidence," and the decision must "fall somewhere on a continuum of reasonableness." *See Phillips*, 405 S.W.2d at 891–92.

The Plan made its decision without any supporting medical records. There were no records from Dr. Drazner after July 22, and the records from Drs. Viere and Diliberti did not

–15–

reflect any misrepresentation by Oliva of his physical condition as alleged by the Plan in its denial letter. Instead, the available medical records indicated that Oliva was progressing as expected after his injury and surgery, and was still undergoing treatment at the time the Plan sued. The estimates of time for recovery made by each of the doctors, including Dr. Drazner, had not yet elapsed. Although the Plan correctly argues that it has discretion to choose among the conflicting opinions of medical providers, *see Corbello v. Sedgwick Claims Management Services, Inc.*, 856 F. Supp. 2d 868, 886 (N.D. Tex. 2012), here there was no conflict. Under these circumstances, the Plan's reliance on surveillance video and Davis's notes of Dr. Drazner's conclusions, especially in the absence of any explanation from the Plan as to how it reached its decision, was arbitrary and capricious. The Plan's decision is not supported by substantial evidence. *See Phillips*, 405 S.W.3d at 891. We decide the Plan's second issue against it.

### C. Damages and Attorney's Fees

In its third issue, the Plan asserts that no evidence supports the damages awarded by the trial court. We review the trial court's findings of fact and conclusions of law for legal and factual sufficiency of the evidence under the standards set forth in our discussion of the Plan's first issue. *See Fulgham*, 349 S.W.3d at 157. The Plan specifically challenges the trial court's findings and conclusions that (1) Oliva would be disabled for "no less than 156 weeks"; (2) $52,247 was the "reasonable and underpaid cost of necessary medical care"; and (3) the Olivas were entitled to recover their attorney's fees in the amount of $177,784.

We agree with the Plan that there is no evidence to support the trial court's award of $52,247 for the reasonable and underpaid cost of necessary medical care. At trial, the Plan objected to the admission of the Olivas' Exhibit 5, billing records from Oliva's treatment at Parkland Health and Hospital System after the Plan terminated benefits, and the Olivas withdrew the exhibit from the trial court's consideration. Exhibit 5 was not admitted into evidence and is

not included in the reporter's record. Although the accompanying medical records were admitted into evidence as Defendants' Exhibit 6, the amounts expended for this treatment are not shown. The Olivas do not point to any evidence in the record to support the trial court's finding that the reasonable and underpaid cost of necessary medical care was $52,247.

With respect to the length of time Oliva would be disabled, the Plan argues that both Dr. Drazner and Dr. Viere concluded that Oliva's injuries "had healed sometime between September 4 and October 9, 2009." The Plan contends that the trial court's finding of 156 weeks constituted speculation. Under the terms of the Plan, however, medical and disability benefits continue until "[t]he expiration of 156 weeks from the date of the Occurrence," unless "maximum medical improvement is achieved" on an earlier date, or unless the claimant is involuntarily terminated for gross misconduct or engages in conduct prohibited by Article VII of the Plan, such as failing to cooperate or making misrepresentations. As we have noted, the Plan offered no medical record stating the date on which Oliva reached maximum medical improvement. Oliva testified that he received further medical treatment for his injuries after the Plan issued its denial, and he submitted supporting medical records for this subsequent treatment. And although in its termination letter the Plan alleged that Oliva violated several provisions of Article VII, no specific conduct was cited and the trial court did not find any such violations. Oliva offered evidence of the amounts he was paid after his injury and before his benefits were terminated from which the trial court could determine the amounts due. Therefore, there is sufficient evidence to support the trial court's finding that the Plan "owes Oliva indemnity benefits under the Plan in an amount of $82,880."

The Plan also challenges the award of attorney's fees, arguing that the award was not supported by the factors described in *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980). The trial court may award reasonable attorney's fees and costs to either

–17–

party in an action under 29 U.S.C.A. § 1132(a)(1)(B) to recover benefits under a plan. *See* 29 U.S.C.A. § 1132(g)(1) (2009) (court in its discretion may allow reasonable attorney's fees and costs to either party). Although the court in *Bowen* applied a five-factor test to determine reasonable attorney's fees under this section, the same court recently explained that the *Bowen* factors are discretionary and are not required. *See LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 846–47 (5th Cir. 2013) (explaining that the United States Supreme Court stated "we do not need to consider the *Bowen* factors," citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 130 S. Ct. 2149, 2158 (2010)). And in any event, the trial court's conclusions of law reflect that the court considered the *Bowen* factors. In *Hardt*, the Court held that under section 1132(g)(1) of ERISA, a court in its discretion may allow a reasonable attorney's fee and costs to either party as long as the party has achieved "some degree of success on the merits." *Id.* at 846 (quoting *Hardt*, 130 S. Ct. at 2151). The Olivas have done so. The Plan makes no other challenge to the trial court's award of attorney's fees.[5]

We sustain the portion of the Plan's third issue challenging the sufficiency of the evidence to support the trial court's award of medical expenses. We decide the remainder of the Plan's third issue against it.

**CONCLUSION**

We overrule the Plan's first and second issues. We reverse the portion of the trial court's judgment awarding the Olivas the sum of "$52,247 for reasonable medical expenses incurred for the necessary treatment of his injuries made the basis of his claim" and render judgment that the Olivas take nothing on their claim for medical expenses incurred. We recalculate the

---

[5] Although the Plan's brief contains a sentence arguing that "there was no evidence from which to apply the multiplier and the lodestar approach," the Plan offers no citation to authority or other argument in support of this contention. Under ERISA, once the trial court determines that a party is entitled to attorney's fees, it must find the number of hours reasonably expended on the case and the reasonable hourly rate for the attorney's services. *See Wegner v. Standard Ins. Co.*, 129 F.3d 814, 822 (5th Cir. 1997). The court must multiply those figures to determine the "lodestar." *Id.* The lodestar is presumed to be the reasonable fee, but may be adjusted after consideration of other factors. *See Koehler v. Aetna Health, Inc.*, 915 F. Supp. 2d 789, 797 (N.D. Tex. 2013). The Olivas' counsel presented evidence of the number of hours reasonably expended on the case and the reasonable hourly rate for his services. This evidence supports the trial court's award.

prejudgment interest awarded to the Olivas accordingly. In all other respects, we affirm the trial court's judgment.

/Michael J. O'Neill/

MICHAEL J. O'NEILL
JUSTICE

130394F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

B & S WELDING LLC WORK RELATED
INJURY PLAN, Appellant

No. 05-13-00394-CV        V.

JUAN PEDRO OLIVA-BARRON AND
AVELINA OLIVA, Appellees

On Appeal from the 95th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 09-12619.
Opinion delivered by Justice O'Neill,
Justice FitzGerald participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment awarding appellees the sum of $52,247 for reasonable medical expenses incurred and judgment is **RENDERED** that appellees Juan Pedro Oliva-Barron and Avelina Oliva take nothing on their claim for reasonable medical expenses incurred. The amount of prejudgment interest awarded in the trial court's judgment is reduced to the sum of $14,102.02. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that appellees Juan Pedro Oliva-Barron And Avelina Oliva recover their costs of this appeal from appellant B & S Welding LLC Work Related Injury Plan.

Judgment entered this 15th day of September, 2014.