**Affirmed and Opinion Filed August 20, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-13-01325-CV

**JOHN H. CARNEY & ASSOCIATES, Appellant**
**V.**
**OFFICE OF THE ATTORNEY GENERAL OF TEXAS AND GLENDAL STOVER,**
**Appellees**

**On Appeal from the 68th Judicial District Courtex**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-02253**

## MEMORANDUM OPINION

Before Justices Bridges, Myers, and Stoddart
Opinion by Justice Bridges

After a bench trial, the court determined appellant John H. Carney & Associates ("Carney") could not recover a percentage of its attorneys' fees from $100,000 in court-ordered restitution from an underlying criminal assault case. The trial court further concluded Carney converted $33,847.46 by retaining such funds.

In four issues, Carney argues there is no evidence, or insufficient evidence, to support the trial court's findings of fact (1) that the $100,000 payment to Glen Stover ("Stover") was a restitution payment; (2) that the $100,000 was not payment in satisfaction of a settlement agreement; (3) that the contingent fee agreement between Carney and Stover required the filing of a civil lawsuit before Carney could collect fees; and (4) that Carney's retention of $33,847.76 was inconsistent with the rights of Stover or the Office of the Attorney General of the State of

Texas (the "AG").  In its remaining issues, Carney challenges the trial court's conclusions of law (5) that legal fees cannot be received for collecting restitution and that such fees cannot be taken out of a restitution payment; (6) that Carney committed conversion by retaining its legal fees; and (7) that certain unsupported findings of fact are erroneous conclusions of law.  We affirm the trial court's judgment.

## Background

On May 21, 2010, Drew McClure and Matthew Cotton assaulted Stover at a party. Stover suffered extensive injuries requiring numerous surgeries, which included two plates and seven screws to reset his wrist, three plates and stitches to repair his "shattered face," and broken teeth.

Shortly after his hospital release, Stover filed a police report.  On May 28, 2010, he hired Bernard Zwillenberg with Carney & Associates to pursue a possible civil suit against McClure and Cotton.  The attorney's fee agreement provided, in relevant part, the following:

> 1.      The Firm will represent the Client for all claims arising out of the following facts: assault of Glen Stover that occurred on or about May 21, 2010 in Dallas County.
>
> 2.      The Firm will devote its efforts to this matter and will perform the legal services necessary to obtain a settlement or will litigate the Client's claims to a judgment.
>
> 3.      The Firm's compensation is 33 1/3% (thirty three and one-third percent) of the gross proceeds received from all sources without limitation and before deductions of any kind if the claim is settled before suit is filed and 45% (forty-five percent) after suit is filed.   The Firm's compensation will be paid from the total proceeds from any compromise, settlement, judgment or recovery, including but not limited to the amounts collected from PIP/Medical Payments, and or Uninsured/Underinsured Motorist coverage.  The Firm's fees will be retained by the Firm out of the funds received on behalf of the Client.

Zwillenberg expressed to Stover the unlikelihood of obtaining any civil settlement against McClure and/or Cotton because they lacked assets.[1] Stover then applied for benefits from the Texas Crime Victims Compensation Fund (the "Fund") on June 21, 2010. Stover ultimately received $43,861.42 from the Fund to cover his medical bills.[2]

On October 26, 2010, Zwillenberg first sent a letter on Stover's behalf to the Dallas district attorney's office asking that Stover be afforded the right of a crime victim under chapter 56 of the Texas Code of Criminal Procedure and given the right to court-ordered restitution from McClure and Cotton. The AG sent notice to Zwillenberg on November 15, 2010 and December 29, 2010 acknowledging its understanding that Zwillenberg represented Stover and that Stover had applied for benefits from the Fund. The notices informed Zwillenberg that "the State is subrogated to all the victim's or claimant's rights to receive or recover benefits for pecuniary loss to the extent compensation is awarded from a collateral source."

Stover testified that from January to July of 2011, he and his sister had numerous conversations with Zwillenberg about restitution. Stover denied having any discussions about a civil release or settlement.

Justin Lord, a felony prosecutor assigned to the assault case, later contacted Stover about restitution. Lord originally suggested $50,000; however, because Stover's medical bills exceeded that amount, Lord later increased the amount to $100,000. Lord testified the $100,000 in restitution was part of McClure's plea deal, which included reducing the felony assault charge to a misdemeanor.

---

[1] McClure and Cotton were college students at the time of the assault.

[2] Stover does not dispute the Fund was entitled to reimbursement in that amount from the $100,000 in restitution.

Lee Bright, McClure's defense attorney, received a $100,000 check from McClure's father on August 12, 2011. Bright then gave the check to Lord, who in turn passed it on to Zwillenberg before the trial court signed McClure's deferred adjudication order. Lord testified, "It was a condition precedent to the plea" and explained it was not uncommon for restitution to be paid prior to sentencing.

When Stover asked Zwillenberg about the check, Zwillenberg said he could pick it up the next day because he would be at the courthouse. Zwillenberg told Stover to stop by his office the next week to get it. Zwillenberg received the check from Lord the next day. Stover believed he would receive the full $100,000 and did not believe attorney's fees, based on their contingent fee agreement, would be paid from the restitution.

Zwillenberg testified that Bright requested a civil release, in exchange for the check, from Stover. Stover testified about a phone conversation with Zwillenberg on August 12, 2011 in which he "vaguely" remembered Zwillenberg discussing a civil release, but he did not understand why he would sign a document releasing McClure from the same $100,000 he was allegedly going to receive in restitution.

Zwillenberg recorded the conversation with Stover, and a transcription of the audio recording was admitted into evidence. During the phone call, Zwillenberg explained the McClures wanted a document releasing them from further civil liability. Zwillenberg wanted to make sure Stover understood; however, Stover first said, "Well, I mean, is there - - I mean, I don't know. Is that an option? Or can I say no to that? . . . I just don't want to sign off on a deal where I mean like - - I mean, that just kind of makes is seem like - - it could just be my, my mistake, but it kind of makes it seem like the ball is in their court, like offering us money, but - - ." When asked later in the conversation if Stover understood what Zwillenberg was talking about, Stover said, "yeah, yeah."

They continued to discuss McClure's probation agreement. Stover said he was "ready to go based on what you guys feel as well, because I don't know if it's really a problem or the right answer." Zwillenberg interpreted Stover's responses as an agreement for Zwillenberg to move forward with a civil release. However, during the last two minutes of the conversation, Stover said, "I'm feeling a little impaired in my judgment until I hear different things." Zwillenberg ended the conversation saying he would do the paperwork and let Stover know if it "goes down or not."

Despite knowing Stover felt impaired in his judgment, Zwillenberg signed a receipt on behalf of Stover stating, "This is to acknowledge receipt of a cashier's check from Drew Austin McClure in the amount of $100,000 for restitution to Glen Stover, the complaining witness in F10-32798, State of Texas versus Drew McClure. Stover will further execute a full and final release of all civil liability . . . on or before 8/23/11." Stover testified he did not know what that meant at the time, and he never agreed to execute a full and final release of all civil liability. In fact, when Zwillenberg asked Stover to sign the release on August 17, 2011, Stover refused.

An email from Zwillenberg, following the August 17 meeting, began by stating, "After you left the office I realized that you did not understand a very fundamental fact in regard to McClure's situation." Zwillenberg tried to explain that McClure's plea deal was only a "proposed plea deal," which McClure could back out of at any time before the judge accepted it. In his opinion, the only way to guarantee Stover's receipt of the $100,000 was by signing the civil release. Stover responded with the following email:

> It is in my best interest that you halt all actions until the final plea on Tuesday, Aug. 23, 2011. After it is official in criminal courts and the pleas are made, I will go from there. Until then it seems it make no sense for me to do anything otherwise until it is a "done deal." I do not want anything to be released, negotiated, paid, signed, processed or anything on my behalf until after that date and it is official in criminal courts of what McClure's and Cotton's outcomes are.

McClure pleaded guilty and entered into a plea agreement on August 23, 2011. During the plea hearing, the trial judge agreed to follow the plea agreement filed with the court, which included "Restitution in the amount of $100,000." The trial judge further acknowledged, "There's $100,000 of restitution that's ordered, and it's my understanding that it's already been paid." The order of deferred adjudication listed $100,000 under "Restitution." The docket sheet further indicated restitution was paid as part of the plea agreement.

A dispute then arose between Stover and Carney over distribution of the $100,000. Carney withheld $33,847.76 from the restitution based on the parties' attorney's fee agreement. After accounting for the AG's subrogation interest based on money paid from the Fund and other medical records/billing fees, Carney cut a check to Stover on September 13, 2011 for $47,994.03. Stover was asked to sign off on the amount as "settlement of my personal injury claim," but he refused and did not accept the check.

The AG presented Carney with a demand for payment of its subrogation interest from money paid by the Fund in the amount of $43,861.42.

Carney filed a petition in interpleader on October 10, 2011 asserting Stover's claims for the remaining money were adverse and in conflict with the Fund's subrogation interest. As an "innocent stakeholder," Carney alleged it faced the possibility of multiple liability and incidental costs. Therefore, Carney deposited $66,152.24 into the registry of the court. Carney kept the money it retained for its attorney's fees segregated in the firm's IOLTA client trust account.

The AG later filed suit against Carney alleging McClure's $100,000 payment to Stover was a restitution payment and not a settlement payment entitling Carney to fees under the attorney's fee contract. Because Carney refused to distribute the appropriate amount of money to both Stover and the Fund, the AG asserted Carney committed conversion with respect to the restitution payment. Stover then filed his petition in intervention.

–6–

The parties participated in a bench trial in May of 2013.  After hearing the above-detailed testimony, the trial court rendered judgment for the AG and Stover.  The trial court noted "this is a case of first impression in regard to whether or not a crime victim can assign to the crime victim's attorney, in a contingency fee contract, a lien interest in a restitution payment made to the victim in relation to a state criminal prosecution."

The court determined the case did not involve a civil settlement and the $100,000 was restitution from which Carney could not claim attorney's fees because "there's no provision for attorney's fees in [the statute]."  The trial court further found Carney converted $33,847.76.  The court then awarded actual damages to the AG in the amount of $14,754.43 and actual damages to Stover in the amount of $19,093.33.

The trial court entered findings of fact and conclusions of law.  Carney filed a motion for new trial, which the trial court overruled.  This appeal followed.

## Standard of Review

In an appeal from a bench trial, we review a trial court's findings of fact under the same legal and factual sufficiency standards used when determining if sufficient evidence exists to support an answer to a jury question.  *B&S Welding LLC Work Related Injury Plan v. Oliva-Barron*, 447 S.W.3d 425, 429 (Tex. App.—Dallas 2014, no pet.).  A challenge to the legal sufficiency of the evidence fails if more than a scintilla of evidence exists to support the finding. *Id*.  The test for legal sufficiency is whether the evidence at trial "would enable reasonable and fair-minded people to reach the verdict under review."  *City of Keller*, 168 S.W. 802, 827 (Tex. 2005).

When considering a factual sufficiency challenge, the reviewing court must consider and weigh all the evidence, not just the evidence that supports the verdict.  *Ludwig v. Encore Med., L.P.*, 191 S.W.3d 285, 294 (Tex. App.—Austin 2006, pet. denied).  The reviewing court may set

aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id.* The reviewing court does not serve as a fact-finder and may not pass upon the witnesses' credibility or substitute its judgment for that of the fact-finder, even if the evidence would clearly support a different result. *Id.*

We review the trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). The appellant may not challenge a trial court's conclusions of law for factual sufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness. *Id.* If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal. *Id.*

## Was the $100,000 Restitution?

In its first issue, Carney argues there is no evidence, or insufficient evidence, to support the trial court's finding that the $100,000 payment to Stover was a restitution payment in satisfaction of McClure's deferred adjudication order.[3] Carney specifically argues the money could not have been made "pursuant to the criminal court's restitution order" because the money was paid prior to the trial court accepting McClure's plea. The AG responds the evidence overwhelmingly supports the trial court's finding the money was restitution, and the restitution payment was not invalid because it was paid prior to the plea agreement.

Carney further asserts article 42.037(f)(1) states "a trial court may not order restitution for a loss for which the victim has received or will receive compensation from a source other than the compensation to victims of crime fund." TEX. CODE CRIM. PROC. ANN. art. 42.037(f)(1) (West Supp. 2014). Because Stover received the money from McClure's father, a third party, Carney argues the trial court was statutorily prohibited from ordering restitution as part of

---

[3] Issue one is a challenge to finding of fact number 1.

–8–

McClure's plea deal. The AG responds Carney's argument is misplaced, and under these facts, the source of the restitution payment is irrelevant. We address each argument in turn.

Despite Carney's argument to the contrary, the evidence supports the trial court's finding that the $100,000 was a restitution payment in satisfaction of McClure's deferred adjudication order. Carney has provided no case law to support its assertion that if an amount of money is negotiated and exchanged prior to the entry of a plea deal, then the money exchanged cannot be restitution made in satisfaction of a later-entered order. Here, the testimony of Assistant District Attorney Lord and the trial court's acknowledgment of the prior payment belies Carney's argument.

Lord explained the $100,000 in restitution was part of McClure's plea deal, which included reducing the felony assault charge to a misdemeanor. Lord testified, "It was a condition precedent to the plea," and it was not uncommon for restitution to be paid prior to sentencing. In this case, Lord knew he was dealing with a young man with no assets of his own to pay the restitution. Therefore, the best way to insure payment was to require payment prior to sentencing.

During McClure's plea hearing, the judge understood, "There's $100,000 of restitution that's ordered, and . . . it's already been paid." McClure agreed it had been paid. The criminal docket sheet included the notation "$100,000 which has been paid," and Lord explained the notation indicated payment prior to the sentencing date. The order of deferred adjudication likewise listed $100,000 under "Restitution."

Several other witnesses testified to their understanding of the character of the payment. Stover testified that at all times, he understood the $100,000 to be restitution in satisfaction of the criminal court's order arising out of the assault. He further testified his conversations with Carney representatives referred to restitution. McClure's defense attorney also testified the

–9–

money was "specifically intended exclusively as restitution" because "that's what we had negotiated." Zwillenberg even admitted the $100,000 was for restitution when he drafted the receipt and stated the money was for "restitution to Glen Stover, the complaining witness in . . . State of TX v. Drew McClure . . . ."

Accordingly, after reviewing the evidence in the light most favorable to the verdict, we conclude legally sufficient evidence supports the trial court's finding that the $100,000 was a restitution payment in satisfaction of the deferred adjudication order. We likewise conclude the finding is not so contrary to the overwhelming weight of the evidence to be clearly wrong and unjust.

We now turn to Carney's argument that because Stover received the money from McClure's father, a third party, the trial court was statutorily prohibited from ordering restitution as part of McClure's plea deal. Article 42.037(f)(1) provides, "The court may not order restitution for a loss for which the victim has received or will receive compensation only from a source other than the compensation to victims of crime fund." TEX. CODE CRIM. PROC. ANN. art. 42.037(f)(1). Carney relies on *Handy v. State*, No. 09-09-00343-CR, 2011 WL 1842718 (Tex. App.—Beaumont May 11, 2011, no pet.) (mem. op., not designated for publication) to support its position.

In that case, the trial court ordered restitution as a condition of community supervision after Handy pleaded guilty to intoxication manslaughter. *Id*. at *1. The record showed Herman, the victim, settled with Hardy's insurance company for $70,000 and received $49,127.84 as the balance owed him after payment of medical expenses incurred for treatment of his injuries. *Id*. at *3. Because Herman received compensation for his injuries from another source, specifically the insurance company, the appellate court concluded the trial court's restitution order was improper. *Id*.

–10–

Here, the record does not reflect that Stover received compensation from a third party other than the Fund. Unlike *Handy*, Stover did not receive payment from any insurance company covering his medical expenses. While we agree McClure's father initially funded the restitution payment, the record does not indicate whether it was considered a loan to his son. Regardless, *Handy* does not stand for the proposition that a restitution order will be invalidated because a criminal defendant receives financial assistance from a third party to pay restitution. Rather, the court's conclusion in *Handy* prevented the victim from receiving an impermissible windfall. Here, Stover did not receive any such windfall prohibited by article 42.037(f)(1). Thus, Carney's reliance on *Handy* is misplaced.

Lastly, Carney makes a passing argument that the restitution order was invalid because the trial court did not hold an evidentiary hearing pursuant to article 42.037(c). TEX. CODE CRIM. PROC. ANN. art. 42.037(c). However, as the AG correctly argues, parties may agree to restitution without an evidentiary hearing. *See Burt v. State*, 445 S.W.3d 752, 759 (Tex. Crim. App. 2014) ("[I]f the parties agree on a restitution amount through stipulation for a plea deal, that agreement itself is a sufficient factual basis to support the restitution order."); *see also Jackson v. State*, 720 S.W.2d 153, 155 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd). As such, Carney's argument is without merit. Having considered each of Carney's arguments, we overrule its first issue.

### Did Stover Agree to a Civil Settlement?

Although we previously concluded the $100,000 was a restitution payment, Carney asserts the money could also have been in consideration of a civil settlement.[4] Thus, we will address Carney's second issue challenging the sufficiency of the evidence to support the trial

---

[4] Carney contends the basic question is whether the $100,000 payment to Stover was made in satisfaction of civil claims, in satisfaction of restitution, or both.

–11–

court's findings that the $100,000 was not in satisfaction of a civil settlement arising out of the assault.[5] The State responds ample evidence supports the trial court's findings, and the record is clear Stover never agreed to any civil release or settlement.

A settlement agreement is judged like any other contract. *Harris v. Balderas*, 27 S.W.3d 71, 79 (Tex. App.—San Antonio 2000, pet. denied) (Green, J., concurring). To be enforceable, it must contain all the elements necessary to form a binding contract. *Id.* A binding contract is made when there is an offer, an acceptance, and a meeting of the minds. The determination of the meeting of the minds is based on the objective standard of what the parties said and did and not on their subjective state of mind. *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.— San Antonio 1999, pet. denied).

Carney argues the trial court's findings "ignore the obvious fact that Zwillenberg made the agreement as Stover's legal counsel and thereby bound him to it regardless of any disagreement between Stover and his legal counsel."[6] We do not agree with Carney's contention.

Assuming without deciding that the $100,000 was also a settlement offer, Stover did not agree to it. The audio recording of the phone conversation between Stover and Zwillenberg shows Stover did not understand what Zwillenberg was asking in regards to a civil release. He said, "I don't know" and "Can I say no to this?" In the last minutes of the conversation, Stover

---

[5] Carney's second issue challenges the following findings of fact:

    2. The $100,000 payment made payable to Glen Stover on August 12, 2011 was not in satisfaction of a civil settlement.

    3. Glen Stover did not, at any time or place, enter into a civil settlement agreement nor was a civil judgment entered into for any claims arising out of the assault of Glen Stover that occurred on or about May 21, 2010.

    4. An offer of civil settlement was not made to Glen Stover for any claims arising out of the assault of Glen Stover . . . .

    5. Glen Stover did not accept an offer of civil settlement for any claims arising out of the assault of Glen Stover . . . .

    6. There was no mutual assent between Glen Stover and the purported offeror of civil settlement for any claims arising out of the assault of Glen Stover. . . .

[6] Carney's statement is troubling, as it ignores Texas Rule of Professional Conduct 1.02(a)(2), which states a lawyer shall abide by a client's decisions "whether to accept an offer of settlement of a matter, except as otherwise authorized by law." Tex. Disciplinary Rules Prof'l Conduct R. 1.02(a)(2), *reprinted in* TEX. GOV'T CODE ANN., tit., 2, subtit. G, app. A (West 2015). Further, it contradicts the parties' fee agreement, which states, "No settlement shall be made by the Firm of the Client without the approval of the other."

–12–

said, "I'm feeling a little impaired in my judgment . . . ." Thus, despite Zwillenberg having "no question" in his mind that he was authorized to enter into an agreed settlement, the recording establishes otherwise.

Moreover, Stover testified he was confused during the phone conversation and "vaguely" remembered Zwillenberg discussing a civil release, but he did not understand why he would sign a document releasing McClure from the same $100,000 he was allegedly going to receive in restitution. He testified "the conversation was very unclear." Additionally, Stover later refused to sign the settlement agreement, and Zwillenberg admitted Stover never signed it. Thus, based on Stover's objective words and actions, there was no meeting of the minds creating an enforceable agreement.

Accordingly, after reviewing the evidence in the light most favorable to the verdict, we conclude legally sufficient evidence supports the trial court's findings that Stover did not accept or enter into any settlement agreement for any claims arising out of the assault.

Terrence Ridgely testified the McClures hired his firm to represent Drew and he worked the civil side of the case, while Lee Bright worked the criminal side. In his opinion, "all the way through it, we were negotiating the civil settlement, along with the restitution." However, he agreed Stover never executed any formal settlement documents. While this evidence weighs against the trial court's findings that the parties did not enter into a civil settlement, the findings are not so contrary to the overwhelming weight of the evidence to be clearly wrong and unjust. Thus, we overrule Carney's second issue.

### Can a Civil Attorney Collect Attorney's Fees From Criminal Restitution?

In its fifth issue, Carney challenges the trial court's conclusion that attorney's fees cannot be collected from a payment of criminal restitution. Carney argues that given its contractual right to a contingent fee for recovery of restitution, the only basis for denying the fee is if the fee

agreement was unenforceable as contrary to public policy. Carney then asserts there is no public policy precluding a crime victim from agreeing to pay an attorney for assisting in collection of criminal restitution. Rather than rely on a public policy argument, the AG focuses on the plain language of the restitution statute to support its position that fees may not be collected from a restitution payment.

When article 42.037 of the Texas Code of Criminal Procedure was enacted by the Texas Legislature in 1993, the purpose was to give trial courts authority "to consider orders of restitution to victims at the time of sentencing." *See* House Comm. on Criminal Jurisprudence, Bill Analysis, Tex. H.B. 2179, 73rd Leg., R.S. (1993). The language throughout the statute emphasizes who may receive restitution. *See* TEX. CODE CRIM. PROC. ANN. art. 42.037. TEX. CODE CRIM. PROC. ANN. art. 42.037(a), (c)(1), (f)(1), (g)(4) (emphasis added). Restitution must be made only to the victim, to the Fund, or to a person who has compensated the victim for the loss when the interest of justice so requires. *Id*., *see, e.g., Lemos v. State*, 27 S.W.3d 42, 48–49 (Tex. App.—San Antonio 2000, pet. ref'd) (recognizing that "restitution exists only for those direct victims of the offense for which the defendant was charged and convicted"); *Ceballos v. State*, 246 S.W.3d 369, 373 (Tex. App.—Austin 2008, pet. ref'd) (noting that except where justice dictates payment be made to a person or party who has compensated the victim for the loss, restitution can be made only to the victim). Nothing within the plain language of the statute allows attorneys to collect fees from restitution.

Neither the A.G. nor Carney has provided any case law in which a court has considered whether an attorney may receive attorney's fees from a victim's restitution. Our research has likewise found none. Given the plain language of the statute and the purpose of restitution, which is to compensate the *victim*, we strongly discourage attorneys from engaging in such

practices.  However, we need not decide that issue to resolve this case.  Under the present facts, we can resolve the attorney's fee issue by analyzing the fee agreement itself.

The agreement stated Carney would be entitled to thirty-three percent of the gross proceeds "necessary to obtain a settlement or will litigate the Client's claims to a judgment."  As explained above, the $100,000 was not part of a civil settlement; therefore, Carney did not obtain any settlement on Stover's behalf.

In further support of this conclusion, Stover testified Lord discussed the possible restitution amounts with him directly.  Stover further explained he and Lord made the decision to demand $100,000 in restitution.

The record likewise shows Zwillenberg did not negotiate for restitution on Stover's behalf.  Rather, Lord and Bright negotiated the amount.  Bright specifically testified that one hundred percent of his negotiations about restitution were with Lord, and he never met with Zwillenberg before the day of the release.

In addition to not obtaining a settlement, Carney did not litigate any claims to a judgment.  This whole case was about McClure agreeing to pay restitution and receiving a reduced sentence in a criminal proceeding and not Stover receiving any settlement or Carney litigating any claims to a judgment in a civil proceeding.  Thus, Carney did not satisfy the terms of the fee agreement to receive any compensation.

In reaching this conclusion, we acknowledge the trial court entered a finding of fact stating the "the attorney client agreement entered into . . . provided that the Client (Glen Stover) will not pay the Firm . . . unless there is a settlement or judgment in a civil case related to the claims covered by the contract."  It did not, however, enter  any conclusions of law pertaining to Carney's performance of the fee agreement because it concluded "Attorneys fees cannot be collected from a payment of criminal restitution."  Regardless, we are not bound by the trial

court's legal conclusions. Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence; incorrect conclusions of law will not require reversal if the controlling findings of fact will support a correct legal theory. *Hennig v. Didyk*, 438 S.W.3d 177, 181 (Tex. App.—Dallas 2014, pet. denied). Thus, we conclude the trial court's ultimate conclusion, that Carney was not entitled to attorney's fees, is supported by the evidence.

**Conversion**

In its final issues, Carney argues there is no evidence, or insufficient evidence, to support its findings that Carney exercised dominion and control over the $33,847.76, which was inconsistent to the rights of Stover and the AG, and resulted in conversion of the funds.

To establish a claim for conversion, a plaintiff must prove (1) the plaintiff owned or had legal possession of the property or legal entitlement to the property; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex. App.—Dallas 2008, no pet.).

Carney's argument rests on the fact that it was entitled to withhold the money based on the fee agreement, which resulted in it having a lien "highest of all priorities." Having concluded Carney was not entitled to withhold its fees from the restitution payment, Carney unlawfully and without authorization exercised control over property to which Stover and the AG had legal entitlement.

Huff confirmed that the Fund paid $43,681.42 on behalf of Stover and had received reimbursement for $29,106.99. She further testified Carney never offered to pay the remaining

$14,754.43 owed from the money withheld as attorney's fees. Stover testified he requested return of the money verbally and through email. Zwillenberg never returned the money.

Accordingly, after reviewing the evidence in the light most favorable to the verdict, we conclude legally sufficient evidence supports the trial court's findings and conclusions that Carney converted $33,847.76. We likewise conclude these findings and conclusions are not so contrary to the overwhelming weight of the evidence to be clearly wrong and unjust. Thus, we overrule Carney's fourth, sixth, and seventh issues.

### Conclusion

Having overruled Carney's issues, we affirm the trial court's judgment.


131325F.P05

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHN H. CARNEY & ASSOCIATES,
Appellant

No. 05-13-01325-CV      V.

OFFICE OF THE ATTORNEY GENERAL
OF TEXAS and GLENDAL STOVER,
Appellees

On Appeal from the 68th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-12-02253.
Opinion delivered by Justice Bridges.
Justices Myers and Stoddart participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellee OFFICE OF THE ATTORNEY GENERAL OF TEXAS
and GLENDAL STOVER recover their costs of this appeal from appellant JOHN H. CARNEY
& ASSOCIATES.

Judgment entered August 20, 2015.